[No. D047857. Fourth Dist., Div. One. Nov. 30, 2006.]

THE OAKS MANAGEMENT CORPORATION, Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
WILLIAM AYYAD et al., Real Parties in Interest.

COUNSEL

Thorsnes Bartolotta McGuire, Daral B. Mazzarella, Vincent J. Bartolotta, Jr.; Dawson & Ozanne, Brendan E. Ozanne; Veljovich Law Group, David A. Veljovich; Neil, Dymott, Frank, Harrison & McFall, Michael I. Neil and Hugh A. McCabe for Petitioner.

No appearance for Respondent.

English & Gloven, Donald A. English and Christy I. Yee for Real Parties in Interest.

OPINION

**McCONNELL, P. J.**—The issue in this appeal is whether the trial court erred by disqualifying a law firm from representing plaintiffs at trial, based on lender-borrower relationships between two of the firm's attorneys and a defendant that ended several years before this litigation commenced. Defendant argued the attorneys received his confidential financial information in conjunction with making loans, and plaintiffs could use it against him here, e.g., in making settlement demands.

We find error and grant the petition. Even if the attorneys did receive defendant's financial information in making loans, he did not meet his burden of showing the information could give plaintiffs an unfair advantage or affect the outcome of this litigation. (*Gregori v. Bank of America* (1989) 207 Cal.App.3d 291, 300, 308 [254 Cal.Rptr. 853] (*Gregori*).) Through no fault of the attorneys, defendant produced to plaintiffs in this action updated financial

information showing substantial income and wealth, and although the court found the production was inadvertent we cannot ignore its practical impact on the disqualification issue. Under the circumstances, disqualification would serve no legitimate purpose and would unfairly deprive plaintiffs of trial counsel of their choice.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

In May 2004 The Oaks Management Corporation and numerous individual condominium owners (collectively Oaks Management) filed a second amended complaint against William Ayyad and William G. Ayyad, Inc. (together Ayyad), and other defendants not involved here, for negligence, fraud, conspiracy, breach of contract, breach of fiduciary duty, breach of implied warranty and related causes of action. The complaint alleges Oaks Management is the governing board of the Oaks Condominiums, a condominium conversion project located in Fallbrook, California; Ayyad and other defendants were involved in the development and sale of the project; defendants ignored grading, water intrusion, structural, landscaping and other problems with the project, and performed cosmetic repairs and marketed the condominium units "as new"; and as a result, purchasers "live in units that have no functioning heat, mold, water intrusion, dry rot, termites, and other significant structural problems."

Oaks Management's attorneys of record were originally Brian Dawson and Brendan Ozanne, of Dawson & Ozanne, and David A. Veljovich, of the Veljovich Law Group (collectively, original counsel). Trial was scheduled for January 2006, and in September 2005 original counsel filed a notice of association of Daral B. Mazzarella and Vincent J. Bartolotta, Jr., of the law firm of Thorsnes Bartolotta McGuire (TBM), as lead trial counsel.

---

[1] Several weeks after oral argument, the parties notified us of a settlement in this case and consented to Oaks Management's withdrawal of its writ petition. We nonetheless conclude the writ petition deserves our review given the dearth of published opinions pertaining to disqualification in the nonclient context, and the age of this court's opinion in *William H. Raley Co. v. Superior Court* (1983) 149 Cal.App.3d 1042 [197 Cal.Rptr. 232] (*Raley*), on which Ayyad principally relies, and post-*Raley* changes in State Bar Rules of Professional Conduct. "Apart from its discretionary authority under California Rules of Court, rule 19(b) [now rule 20(c)], a reviewing court has inherent discretion to resolve issues of continuing public interest, even though those issues may have become moot in the particular case before it." (*DuBarry Internat., Inc. v. Southwest Forest Industries, Inc.* (1991) 231 Cal.App.3d 552, 556, fn. 2 [282 Cal.Rptr. 181].)

Ayyad moved to disqualify TBM on the ground its attorneys have knowledge of his personal finances and Oaks Management can use the information to his disadvantage, for instance in settlement negotiations. Ayyad submitted a declaration that stated in 1995 he began obtaining loans for the acquisition and development of real property through Pacific West Realty Group (Pacific West), a broker that facilitates loans through private investors. The private investors that funded Ayyad's loans included MTT Partners, LP (MTT Partners), of which Michael T. Thorsnes is the general partner, and VJB Partners, LP (VJB Partners), of which Bartolotta is the general partner. Bartolotta is a partner in the TBM firm, and Thorsnes was previously a partner and has now retired to "of counsel" status. Between 1995 and 1998 Ayyad acquired five loans through Pacific West, of which MTT Partners contributed a total of $901,000, and in 1999 he borrowed $600,000 through Pacific West, of which MTT Partners contributed $100,000 and VJB Partners contributed $50,000. Ayyad satisfied the last of the loans in 2001.

Ayyad's declaration also stated he was required to present information to Pacific West on the properties he sought to purchase, pro formas, rent rolls and financial statements. Ayyad understood Pacific West provided the information to individual investors so they could determine whether to make a loan and he provided the information with the expectation of confidentiality. Ayyad submitted copies of his 1999 loan application and supporting documents, which revealed his real estate holdings, assets, liabilities and net worth.[2]

Further, Ayyad's declaration stated that in 2005 Thorsnes, on behalf of a third party, sought investment capital from Ayyad. According to the declaration, during a meeting Ayyad attended Thorsnes told the third party Ayyad "was a good 'borrower,' " and made other "general comments" about Ayyad, his financial history and his businesses.

Ayyad also submitted a declaration by Harry Bigham, a certified financial planner and vice-president of Pacific West. The declaration stated he custom-

---

[2] The record in this writ proceeding did not originally contain copies of the 1999 loan application and supporting data. Ayyad asked the trial court to lodge the documents under seal for in camera review, and Oaks Management advises in its petition that its attorneys "were not provided even a redacted version of the information." Generally, a party moving for disqualification is not required to disclose the actual information contended to be confidential, but must advise the court of the nature of the material and its relationship to the litigation. (*Shadow Traffic Network v. Superior Court* (1994) 24 Cal.App.4th 1067, 1085 [29 Cal.Rptr.2d 693].) We requested copies of the 1999 documents from Ayyad and he has lodged them under seal.

arily provided investors with information pertaining to the borrower's financial ability to repay the loan. In October 1999 Bigham held separate meetings with Thorsnes and Bartolotta to discuss underwriting the Ayyad loan, and he brought loan files for each of them that summarized Ayyad's qualifications and included a copy of his financial statement. On conclusion of the meetings, Thorsnes and Bartolotta instructed Bigham to maintain the loan files at Pacific West with other documents of theirs, to which they had access during business hours.

Bigham's supplemental declaration stated he did not recall revealing any of Ayyad's specific financial information to Thorsnes or Bartolotta or whether either of them ever accessed their files at Pacific West, and they had now instructed him to dispose of any information in the files pertaining to Ayyad. A third declaration by Bigham stated: "Although I may not have 'specific present recollections' about the specific information provided or the exact words used during my meetings with . . . Thorsnes . . . and . . . Bartolotta . . . relating to . . . Ayyad's . . . loan in 1999, my recollection is that I did convey general financial information regarding . . . Ayyad to [them] to allow them to decide whether to invest in this loan."

In its opposition, Oaks Management argued Ayyad waived any right of confidentiality by, in 2004, voluntarily producing in this action a 2001 loan application for the property involved here, which contained more current financial information and showed he had substantial monthly income and net worth. Oaks Management also argued Thorsnes and Bartolotta did not actually receive any of Ayyad's financial information from Pacific West. Bartolotta submitted a declaration that stated when making loans through Pacific West he relied on its evaluation and expertise, and he did not review any financial information of borrowers. Thorsnes submitted a declaration that stated he had no recollection of receiving or reviewing any of Ayyad's financial information.

In reply, Ayyad submitted a supplemental declaration that stated he did not authorize or consent to the production of his 2001 loan application and was shocked to learn of it.

After hearings on November 10 and 30, 2005, the court granted Ayyad's motion to disqualify the TBM firm, pursuant to State Bar Rules of Professional Conduct, rule 1-100[3] and this court's opinion in *Raley, supra,* 149 Cal.App.3d

---

[3] All rule references are to the State Bar Rules of Professional Conduct, which regulate the professional conduct of members of the California State Bar. (Rule 1-100(A).)

1042, among other cases. Based on Bigham's declarations, the court presumed Thorsnes and Bartolotta had learned of Ayyad's 1999 financial information. The court explained: "An attorney, while acting in a role other than as an attorney, owes a duty of confidentiality to a non-client, who later becomes his adversary. The mere possibility that the confidential financial information acquired by Attorneys Thorsnes and Bartolotta while they acted as lenders to Mr. Ayyad could be useful in this litigation, either for settlement offer purposes or in negotiation tactics, is sufficient to establish a conflict of interest necessitating disqualification. . . . The key factor is the attorney's receipt of confidential information while acting in his dual status and the risk of using that information to gain an advantage of his adversary." The court rejected the argument that Ayyad had waived his right of confidentiality by inadvertently producing the 2001 financial information in this case.

This writ proceeding followed, and we initially denied the petition summarily. Oaks Management successfully sought review, and the Supreme Court transferred the matter to us to issue an order to the superior court to show cause why the relief sought in the petition should not be granted. Trial had been rescheduled for June 2006, and on our own motion we stayed trial pending resolution of this proceeding.

## DISCUSSION[4]

### I

### *Standard of Review*

"Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion. [Citations.] If the trial court resolved disputed factual

---

[4] Preliminarily, we dispose of Ayyad's request that we discharge the order to show cause and deny the petition without considering its merits because it does not set forth factual allegations in numbered paragraphs. Ayyad submits that requirement is set forth in California Rules of Court, rule 56(b). Petitioners commonly use numbered paragraphs voluntarily, but rule 56(b) has no such requirement. Further, neither of the cases Ayyad cites concerns the discharge of an order to show cause or alternative writ because the petition lacked numbered paragraphs. (*Pedlow v. Superior Court* (1980) 112 Cal.App.3d 368, 369–373 [169 Cal.Rptr. 326] [petitioner failed to submit any record of proceedings before trial]; *Krueger v. Superior Court* (1979) 89 Cal.App.3d 934, 938–939 [152 Cal.Rptr. 870] [petition was unverified and included no factual statement of the nature of petitioner's complaint].) Ayyad's request is without merit.

Further, we grant Ayyad's May 5, 2006 unopposed motion to augment the record. We deny Ayyad's May 5, 2006 opposed request for judicial notice, and Oaks Management's May 22, 2006 opposed request to augment the record.

issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence. [Citations.] When substantial evidence supports the trial court's factual findings, the appellate court reviews the conclusions based on those findings for abuse of discretion. [Citation.] However, the trial court's discretion is limited by the applicable legal principles. [Citation.] Thus, where there are no material disputed factual issues, the appellate court reviews the trial court's determination as a question of law." (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1143–1144 [86 Cal.Rptr.2d 816, 980 P.2d 371] (*SpeeDee Oil*).)

The parties disagree as to the correct standard of review. Ayyad contends an abuse of discretion standard applies as the trial court resolved disputed issues of material fact, such as whether TBM attorneys acquired his personal financial information during the borrower-lender relationship and whether he waived confidentiality by producing his 2001 loan application in this litigation. Oaks Management asserts that accepting the court's factual findings as true, it erred as a matter of law by disqualifying the TBM firm and thus an independent review standard applies. We agree with Oaks Management and review the matter de novo.

II

*Disqualification Principles*

A

█ "A judge's authority to disqualify an attorney has its origins in the inherent power of every court in the furtherance of justice to control the conduct of ministerial officers and other persons in pending judicial proceedings." (*Neal v. Health Net, Inc.* (2002) 100 Cal.App.4th 831, 840 [123 Cal.Rptr.2d 202]; see also Code Civ. Proc., § 128, subd. (a)(5).) "The power is frequently exercised on a showing that disqualification is required under professional standards governing avoidance of conflicts of interest or potential adverse use of confidential information." (*Responsible Citizens v. Superior Court* (1993) 16 Cal.App.4th 1717, 1723–1724 [20 Cal.Rptr.2d 756].)

"Motions to disqualify counsel present competing policy considerations. On the one hand, a court must not hesitate to disqualify an attorney when it is satisfactorily established that he or she wrongfully acquired an unfair advantage that undermines the integrity of the judicial process and will have a

continuing effect on the proceedings before the court. [Citations.] On the other hand, it must be kept in mind that disqualification usually imposes a substantial hardship on the disqualified attorney's innocent client, who must bear the monetary and other costs of finding a replacement. A client deprived of the attorney of his [or her] choice suffers a particularly heavy penalty where . . . his [or her] attorney is highly skilled in the relevant area of the law." (*Gregori, supra*, 207 Cal.App.3d at p. 300.)

■ "The paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar. The important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process." (*SpeeDee Oil, supra*, 20 Cal.4th at p. 1145.) Generally, the disqualification of an attorney vicariously disqualifies his or her firm. (*Raley, supra*, 149 Cal.App.3d at pp. 1048–1049.)

B

■ Disqualification motions appear to arise most frequently in the attorney-client context. "[T]he per se rule of disqualification . . . generally prevents an attorney from undertaking a representation which is adverse to a current client. [Citation.] The attorney's *duty of undivided loyalty* prevents such simultaneous representation, even on matters which are wholly unrelated [citation], without the informed written consent of both clients." (*Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft* (1999) 69 Cal.App.4th 223, 230 [81 Cal.Rptr.2d 425], italics added; see *Flatt v. Superior Court* (1994) 9 Cal.4th 275, 284 [36 Cal.Rptr.2d 537, 885 P.2d 950] ["The primary value at stake in cases of simultaneous or dual representation is the attorney's duty—and the client's legitimate expectation—of *loyalty*, rather than confidentiality."].)

Additionally, disqualification may be based on successive representation. "Where the potential conflict is one that arises from the *successive* representation of clients with potentially adverse interests, the courts have recognized that the chief fiduciary value jeopardized is that of client *confidentiality*. Thus, where a former client seeks to have a previous attorney disqualified from serving as counsel to a successive client in litigation adverse to the interests of the first client, the governing test requires that the client demonstrate a '*substantial relationship*' between the subjects of the antecedent and current representations." (*Flatt v. Superior Court, supra*, 9 Cal.4th at p. 283.)

When a substantial relationship is shown, the attorney's access to confidential information during the first representation is presumed and disqualification in his or her representation of the second client is mandatory. (*Ibid.*)

■ Further, disqualification *may* be proper when, as here, an attorney-client relationship is not at issue. In *Raley, supra,* 149 Cal.App.3d 1042, this court explained: "Professional responsibilities do not turn on whether a member of the State Bar acts as a lawyer. 'One who is licensed to practice as an attorney in this state must conform to the professional standards in whatever capacity he [or she] may be acting in a particular matter. [Citation.]' " (*Id.* at p. 1046, citing *Libarian v. State Bar* (1943) 21 Cal.2d 862, 865 [136 P.2d 321]; see *Baron v. City of Los Angeles* (1970) 2 Cal.3d 535, 542 [86 Cal.Rptr. 673, 469 P.2d 353].)

In *Raley,* former rule 5-102(B) was at issue, which provided: " 'A member of the State Bar shall not represent conflicting interests, except with the written consent of all parties concerned.' " (*Raley, supra,* 149 Cal.App.3d at p. 1046.) Relying on a formal opinion of the State Bar, we interpreted former rule 5-102(B) to extend to conflicts of interest arising from an attorney's relationship with a nonclient when the relationship " 'creates an expectation that the attorney owes a duty of fidelity. It may also arise . . . where the attorney has acquired confidential information in the course of such a relationship which will be, or may appear to the person or entity to be, useful in the attorney's representation in an action on behalf of a client.' " (*Raley, supra,* 149 Cal.App.3d at p. 1047.)

In *Raley,* we held a conflict of interest disqualified a law firm (Gray, Cary) from representing a plaintiff (Carroll) in an action, when a bank as trustee held 100 percent of the stock of the defendant company (Raley), and a senior partner in the law firm (ZoBell) was a director of the bank and on the trust committee, which directed Raley. (*Raley, supra,* 149 Cal.App.3d at p. 1045.) We pointed out that "ZoBell's duties on behalf of the [b]ank will require him to focus on the weaknesses of Carroll's lawsuit while, at the same time, ZoBell's law firm advocates the merits of Carroll's action." (*Id.* at p. 1047.) Further, "ZoBell's fiduciary relationship with Raley and the [t]rust through his positions with the [b]ank and the [trust] [c]ommittee, on the one hand, and his partnership status with Gray, Cary, on the other hand, places [the firm] on both sides of Carroll's lawsuit." (*Ibid.*)

■ In *Raley,* we emphasized that the propriety of disqualification depends on the circumstances of the particular case in light of competing interests. "The court must weigh the combined effect of a party's right to

counsel of choice, an attorney's interest in representing a client, the financial burden on a client of replacing disqualified counsel and any tactical abuse underlying a disqualification proceeding against the fundamental principle that the fair resolution of disputes within our adversary system requires vigorous representation of parties by independent counsel unencumbered by conflicts of interest." (*Raley, supra*, 149 Cal.App.3d at p. 1048.)

## III

### *Disqualification Is Unwarranted*

#### A

In contending the court correctly disqualified the TBM firm, Ayyad relies predominately on *Raley*. After *Raley* was published, however, important changes were made to the Rules of Professional Conduct. Former rule 5-102, along with former rule 4-101 (requiring attorneys to preserve the confidentiality of client matters), became part of current rule 3-310 following the Supreme Court's adoption of the revised Rules of Professional Conduct on November 28, 1988 (eff. May 27, 1989, and amended eff. Sept. 14, 1992). (*Flatt v. Superior Court, supra*, 9 Cal.4th at p. 288, fn. 5; *Metro-Goldwyn-Mayer, Inc. v. Tracinda Corp.* (1995) 36 Cal.App.4th 1832, 1838 [43 Cal.Rptr.2d 327].) Unlike former rule 5-102, rule 3-310 controls conflicts of interest and disqualification motions *only in the context of attorney-client relationships*. (*In re Lee G.* (1991) 1 Cal.App.4th 17, 27 [1 Cal.Rptr.2d 375] [rule 3-310 "never becomes applicable where the party seeking the attorney's disqualification fails to establish that such party was or is ' "represented" ' by the attorney 'in a manner giving rise to an attorney-client relationship' "]; *American Airlines, Inc. v. Sheppard, Mullin, Richter & Hampton* (2002) 96 Cal.App.4th 1017, 1032–1034 [117 Cal.Rptr.2d 685]; *Allen v. Academic Games Leagues of America, Inc.* (1993) 831 F.Supp. 785, 787 (*Allen*).) Rule 3-310 is inapplicable here because there was no attorney-client relationship between TBM attorneys and Ayyad.

Moreover, although courts have cited *Raley* after the abrogation of former rule 5-102 (see, e.g., *Allen, supra*, 831 F.Supp. at pp. 788–789), it is also distinguishable on its *facts*, which are more compelling than those here. Again, in *Raley*, during the litigation at issue the bank as trustee owned Raley's stock, and the trust committee of which the attorney was a member appointed the company's board of directors, operated the company and had

settlement authority in lawsuits. As this court noted, the attorney's positions with the bank placed his firm on both sides of the lawsuit. (*Raley, supra,* 149 Cal.App.3d at pp. 1044–1045.) Further, the court held the attorney's relationship with the nonclient " 'create[d] an expectation that the attorney owe[d] a duty of *fidelity.*' " (*Id.* at p. 1047, italics added.) As the court explained in *Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft, supra,* 69 Cal.App.4th at page 234, the situation in *Raley* was "akin to that of simultaneous representation, where a law firm was in effect on both sides of a lawsuit. In simultaneous representation cases the paramount consideration is the duty of loyalty."

■ Here, there is no direct conflict like the one in *Raley*. No TBM attorney sat on the board of directors of Ayyad's business and Ayyad was not "asked to confront" the same law firm "in both the courtroom and the board room." (*Raley, supra,* 149 Cal.App.3d at p. 1049.) Ayyad had borrower-lender relationships with MTT Partners and VJB Partners, and it is established that absent special circumstances not present here a loan transaction is at arm's length and there is no fiduciary relationship between the borrower and lender. (*Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 579, fn. 2 [37 Cal.Rptr.2d 653]; *Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 [21 Cal.Rptr.2d 834]; *Peterson Development Co. v. Torrey Pines Bank* (1991) 233 Cal.App.3d 103, 119 [284 Cal.Rptr. 367]; *Nymark v. Heart Fed. Savings & Loan Assn.* (1991) 231 Cal.App.3d 1089, 1093, fn. 1 [283 Cal.Rptr. 53]; *Copesky v. Superior Court* (1991) 229 Cal.App.3d 678, 690 [280 Cal.Rptr. 338]; *Price v. Wells Fargo Bank* (1989) 213 Cal.App.3d 465, 476 [261 Cal.Rptr. 735]; *Mitsui Manufacturers Bank v. Superior Court* (1989) 212 Cal.App.3d 726, 732–733 [260 Cal.Rptr. 793]; *Lawrence v. Bank of America* (1985) 163 Cal.App.3d 431, 437 [209 Cal.Rptr. 541].) In *Copesky v. Superior Court, supra,* 229 Cal.App.3d 678, 693, footnote 14, this court cautioned against the "loose characterization" of financial relationships as "fiduciary, quasi-fiduciary or fiduciary like," as in ordinary banking transactions "the bank is in no sense a true fiduciary."

Ayyad ignores this body of law and persists in claiming Thorsnes and Bartolotta have duties of "fidelity" that ethically preclude their firm from accepting employment adverse to him. At oral argument, Ayyad cited *Valley Bank of Nevada v. Superior Court* (1975) 15 Cal.3d 652 [125 Cal.Rptr. 553, 542 P.2d 977] (*Valley Bank*), in which the issue was under what circumstances a litigant may, through civil discovery, obtain financial information from a bank that its customer had disclosed in confidence. The court held that under the newly adopted article I, section 1 of the California Constitution, a

bank customer has a reasonable expectation of privacy with respect to financial information disclosed to the bank (*Valley Bank, supra*, at p. 656), and before a bank may produce such information in litigation it must take reasonable steps to notify the customer of the pendency and nature of the proceedings and afford the customer the opportunity to assert his or her interests in the matter. (*Id.* at p. 658.) *Valley Bank* does not hold there is a duty of fidelity between a lender and borrower, and indeed the opinion does not mention the terms "fidelity," "loyalty" or "fiduciary."

## B

■ Because no duty of fidelity is at issue, the "primary consideration . . . in this instance is one of confidentiality rather than loyalty." (*Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft, supra*, 69 Cal.App.4th at p. 234; see *Raley, supra*, 149 Cal.App.3d at p. 1047.) We agree Ayyad had a reasonable expectation of privacy in the financial information he revealed to Pacific West to obtain loans, but when no attorney-client relationship exists "[m]ere exposure to the confidences of an adversary does not, standing alone, warrant disqualification." (*In re Complex Asbestos Litigation* (1991) 232 Cal.App.3d 572, 589 [283 Cal.Rptr. 732].) "Such a rule would nullify a party's right to representation by chosen counsel any time inadvertence or devious design put an adversary's confidences in an attorney's mailbox." (*Ibid.*)

Rather, "[s]ince the purpose of a disqualification order must be prophylactic, not punitive, the significant question is whether there exists *a genuine likelihood that the status or misconduct of the attorney in question will affect the outcome of the proceedings before the court.* Thus, disqualification is proper where, as a result of a prior representation or through improper means, there is a reasonable probability counsel has obtained information the court believes would likely *be used advantageously against an adverse party during the course of the litigation.* . . . Disqualification is inappropriate . . . simply to punish a dereliction that will likely have *no substantial continuing effect on future judicial proceedings.*" (*Gregori, supra*, 207 Cal.App.3d at pp. 308–309, italics added.)

At oral argument, Ayyad asserted the prejudice test of *Gregori* is inapplicable because *Raley* controls and the disqualification there was not based on any type of harm. That is incorrect, because in *Raley, supra*, 149 Cal.App.3d at page 1049, we considered the issue of harm as follows: "ZoBell's ongoing dual

status creates a risk of misappropriation of confidential information about Raley pertinent to Carroll's lawsuit," and "[a]lthough Carroll has a right to counsel of his choice, and Gray, Cary has an interest in representing Carroll, these factors are heavily outweighed by the ongoing risk presented to the protection of confidential information about Raley." (*Id.* at p. 1050.) We further explained, "Raley should not be asked to confront Gray, Cary in both the courtroom and the board room. To verify Gray, Cary is not taking advantage of this conflict, Raley will have to take further periodic legal steps, thereby injecting separate issues and proceedings into the litigation. In large part the financial burden and administrative disruption caused by this legal wrangling unrelated to the merits of Carroll's lawsuit will be borne by Raley and the court." (*Id.* at p. 1049.)

Moreover, in *Raley* we set forth a balancing test that necessarily requires a consideration of potential harm. In *Allen, supra*, 831 F.Supp. 785, the court explained that factors considered in *Raley*'s balancing test "must be evaluated against whether the adversarial system is compromised in the present case by the attorney's conflict of interest." (*Allen*, at p. 789.) When an attorney cannot use confidential information gleaned from a nonclient to his or her disadvantage, the adversarial system would not be compromised by allowing the attorney to represent the opposing party. A "no harm, no foul" rule is applicable and Ayyad was required to show prejudice.

It is undisputed that in 2004, during discovery in this action, Ayyad produced personal financial information from 2001, which is two years more current than the most recent information he submitted to obtain loans through Pacific West. The information revealed that in 2001 he had substantial monthly income and net worth. It is undisputed that Oaks Management, its original counsel and the TBM firm are privy to the 2001 information, and the information is obviously also available to its current counsel.[5] The court found the production was inadvertent, but notably, it did not address the effect of the production on the requirement of prejudice.

Inadvertently produced privileged material cannot be used at trial (*State Comp. Ins. Fund v. WPS, Inc.* (1999) 70 Cal.App.4th 644, 656–657 [82 Cal.Rptr.2d 799]; *O'Mary v. Mitsubishi Electronics America, Inc.* (1997) 59 Cal.App.4th 563, 577 [69 Cal.Rptr.2d 389]), but there is also no suggestion the financial information Ayyad submitted to Pacific West to obtain loans can

---

[5] After TBM's disqualification Oaks Management substituted in another law firm in place of its original counsel. We reject Ayyad's contention the substitution renders the petition for writ relief moot.

be introduced at trial. Rather, Ayyad's theory is that the mere knowledge of TBM attorneys of his wealth gives Oaks Management an advantage in settlement negotiations or other matters. Oaks Management and its attorneys, however, cannot unlearn the 2001 financial information Ayyad produced here, and thus any possible receipt by Thorsnes or Bartolotta of his 1999 financial information is immaterial and would have "no substantial continuing effect on future judicial proceedings." (*Gregori, supra,* 207 Cal.App.3d at p. 309.) In other words, the parties are in the same position whether or not Thorsnes or Bartolotta reviewed Ayyad's 1999 loan application.

Ayyad relies on *Chronometrics, Inc. v. Sysgen, Inc.* (1980) 110 Cal.App.3d 597 [168 Cal.Rptr. 196] (*Chronometrics*), to dispute Oaks Management's contention the disqualification of the TBM firm accomplishes nothing given Ayyad's production of his 2001 financial information. In *Chronometrics,* an attorney was disqualified from representing the plaintiff corporations in lawsuits based on his wrongful contact with a defendant. The case was based on former rule 7-103, which provided " '[a] member of the State Bar shall not communicate directly or indirectly with a party whom he knows to be represented by counsel upon a subject of controversy, without the express consent of such counsel.' " (110 Cal.App.3d at p. 603.)[6]

The attorney (Albertini) was also the president of one of the corporations, and the court noted that even if disqualified he could use the information he wrongfully obtained from the defendant. The court concluded, however, that "it cannot be said that the [trial] court's order served no useful purpose in exercising proper control of the proceedings before the court. As counsel, Albertini would have the improperly obtained facts instantly available in his mind in questioning witnesses, making and responding to objections and addressing the court and jury. Albertini as counsel would be in quite a different position from a substituted counsel who might acquire such information second hand by discussions with Albertini before or after court sessions or during recesses. It was not an abuse of the court's discretion to refuse to permit the wrongfully obtained information to be used by Albertini directly in the proceedings before the court." (*Chronometrics, supra,* 110 Cal.App.3d at pp. 607–608.)

■ Here, Thorsnes and Bartolotta did not wrongfully obtain facts. Further, Bartolotta denied he ever reviewed Ayyad's financial information in providing loans, and Thorsnes did not recall having done so. Although the court nonetheless presumed the attorneys received the information, it is

---

[6] This prohibition now appears at rule 2-100.

apparent that neither of them has the facts of the 1999 loan application "instantly available" for use against Ayyad. In any event, *Chronometrics* is unhelpful because it does not concern the unusual circumstances here. Because of Ayyad's production of his 2001 financial information the TBM firm is not in a stronger position than any other attorney for Oaks Management to exploit knowledge of Ayyad's wealth as of 2001. The *Chronometrics* court recognized that when the alleged conflict "has no substantial continuing effect on the judicial proceedings to occur in the future, neither the court's inherent power to control its proceedings nor Code of Civil Procedure section 128 can be stretched to support the disqualification." (*Chronometrics, supra,* 110 Cal.App.3d at p. 607.)

*Raley* does not support the court's ruling because here there is neither a duty of loyalty nor risk of a breach of confidentiality that could adversely affect Ayyad's position in the litigation. Further, *Allen, supra,* 831 F.Supp. 785, on which Ayyad also relies, is inapplicable for similar reasons as *Raley*. In *Allen* the court held the attorney for the defendant businesses had a fiduciary duty to the plaintiff business arising from a 15-year relationship, including being on its advisory committee and attending board meetings. At one meeting, the attorney was informed of potential trademark and copyright infringements by the defendants, and yet he remained affiliated with the plaintiff for more than a year and took no steps to isolate himself from the litigation. The court concluded the attorney's role with the plaintiff was tantamount to that of a corporate director, and "placed him in a position of trust and confidence to the extent that he would act in the best interests of [plaintiff]." (*Allen, supra,* at p. 788.) Such concerns are not at issue here.

The *Allen* court cited *Raley* and rule 1-100, which provides the State Bar Rules of Professional Conduct are intended "to protect the public and to promote respect and confidence in the legal profession." At the hearing before the trial court, Ayyad argued his motion was based on rule 1-100 and "the integrity of the court." However, allowing the TBM firm to represent Oaks Management does not undermine the integrity of the judiciary or the bar, as the lender-borrower relationship was not of a fiduciary nature, it ended several years before this litigation began, Thorsnes and Bartolotta have not engaged in any wrongdoing, and Oaks Management and its attorneys are privy to 2001 information pertaining to Ayyad's wealth from Ayyad himself.

As Oaks Management notes, after TBM "is excised from the case, the remaining lawyers, as well as any new lawyers associated by [p]laintiffs to replace TBM, will *still* know his assets, liabilities [and] net worth. . . . Disqualification of the lawyers who 'presumably' know [Ayyad's] 1999 and earlier assets, liabilities and net worth, while allowing lawyers with *undisputed* knowledge of [his] 2001 assets, liabilities [and] net worth . . . , to

remain active in the case" is illogical. As Oaks Management also points out, "[h]ow the 1999 information, as distinct from the 2001 . . . information, might be useful is not apparent nor is it explained by [Ayyad]."

To any extent the court felt there was arguably an appearance of impropriety, in California that is not a sufficient ground for disqualification of an attorney. " 'Canon 9 of the American Bar Association Model Code of Professional Responsibility (hereinafter Canon 9) provides that: "A lawyer should avoid even the appearance of professional impropriety." ' . . . 'California has not adopted Canon 9, either in the Rules of Professional Conduct . . . or in the Business and Professions Code . . . .' " (*Hetos Investments, Ltd. v. Kurtin* (2003) 110 Cal.App.4th 36, 47 [1 Cal.Rptr.3d 472].) " 'Despite the many references to the appearances standard in our case law, and despite occasional judicial statements that "[d]isqualification is proper . . . to avoid any appearance of impropriety" [citation], there is no California case in which an attorney has been disqualified *solely* on this basis. Invariably, Canon 9 has been relied upon to disqualify counsel only where the appearance of impropriety arises in connection with a tangible dereliction.' " (*Ibid.*; see *DCH Health Services Corp. v. Waite* (2002) 95 Cal.App.4th 829, 833 [115 Cal.Rptr.2d 847] [" ' "Speculative contentions of conflict of interest cannot justify disqualification of counsel." [Citation.]' "]; *Fox Searchlight Pictures, Inc. v. Paladino* (2001) 89 Cal.App.4th 294, 302 [106 Cal.Rptr.2d 906] ["A motion to disqualify will not be granted when only a hypothetical conflict exists."]; *Gregori, supra,* 207 Cal.App.3d at p. 308 [" 'Specific facts must point to a marked danger that the perceived evil . . . will result.' "].)[7]

Because the evidence does not establish any likelihood that Oaks Management can use Ayyad's 1999 financial information to his disadvantage, disqualification would serve no useful purpose and Oaks Management's right to trial counsel of its choice must prevail. "The right of a party to be represented in litigation by the attorney of [its] choice is a significant right [citation] and ought not to be abrogated in the absence of some indication the integrity of the judicial process will otherwise be injured." (*Johnson v. Superior Court* (1984) 159 Cal.App.3d 573, 580 [205 Cal.Rptr. 605].)[8]

---

[7] "[U]nlike the California Rules of Professional Conduct that apply to attorneys, the California Code of Judicial Conduct, which applies to judges, does adopt the appearances standard. Canon 2 of the Code provides that 'A Judge Should Avoid Impropriety and the Appearance of Impropriety in All His [or Her] Activities.' " (*Gregori, supra,* 207 Cal.App.3d at p. 308, fn. 14.) As the court noted in *Gregori,* "public confidence in the integrity of the judicial process depends much more heavily on the conduct and impartiality of judges than that of lawyers." (*Ibid.*)

[8] The issue of whether the TBM firm would have been subject to disqualification absent Ayyad's production of his 2001 financial documents is not before us and we express no opinion on the matter.

---

## DISPOSITION

Let a writ of mandate issue directing the trial court to vacate its order granting Ayyad's motion to disqualify the TBM firm, and to enter a new order denying the motion. Plaintiffs are entitled to costs incurred in these proceedings. The stay issued on April 5, 2006, is vacated.

Benke, J., and Nares, J., concurred.

A petition for a rehearing was denied December 28, 2006, and the petition of real parties in interest for review by the Supreme Court was denied February 28, 2007, S149419.