Filed 1/7/19 (unmodified opinion attached)

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CITY OF SAN DIEGO, | D073961 |
| Petitioner, | |
| | (San Diego County Super. Ct. No. 37-2014-00013755-CU-OE-CTL) |
| v. | |
| THE SUPERIOR COURT OF SAN DIEGO COUNTY, | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Respondent; | |
| DANA HOOVER, | **NO CHANGE IN JUDGMENT** |
| Real Party in Interest. | |

THE COURT:

It is ordered that the opinion filed December 28, 2018 be modified as follows:

1. Throughout the opinion, insert "former" before "Rule 2-100" to read as "former Rule 2-100."

2. The language of footnote 1 on page 3 is deleted and the following language inserted in its place:

All further rule references are to the California State Bar Rules of Professional Conduct unless otherwise indicated. Those rules were revised and renumbered effective November 1, 2018. The substance of former Rule 2-100(A), at issue in this case, became Rule 4.2(a) of the revised Rules. We refer to "former Rule 2-100" throughout the opinion for purposes of this appeal.

**The petition for rehearing is denied.**

**There is no change in judgment.**

HUFFMAN, Acting P. J.

Copies to: All parties

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CITY OF SAN DIEGO,<br><br>        Petitioner,<br><br>        v.<br><br>THE SUPERIOR COURT OF SAN DIEGO COUNTY,<br><br>        Respondent;<br><br>DANA HOOVER,<br><br>        Real Party in Interest. | D073961<br><br><br><br>(San Diego County Super. Ct.<br>No. 37-2014-00013755-CU-OE-CTL) |

ORIGINAL PROCEEDINGS in mandate following granting of motion to disqualify counsel. Katherine A. Bacal, Judge. Petition granted.

Mara W. Elliot, City Attorney, George F. Schaefer, Assistant City Attorney, Michael J. McGowan, Deputy City Attorney for Petitioner.

No appearance for Respondent.

The Gilleon Law Firm, James C. Mitchell and Daniel M. Gilleon for Real Party in Interest Dana Hoover.

As codified in Evidence Code section 950 et seq., the attorney-client privilege seeks to *prevent* the disclosure of confidential communications between the lawyer and the client. In the typical situation, where a question at trial or a pretrial discovery request seeks disclosure of arguably privileged information, an objection to the question or request is raised and the trial court rules on the objection based on whether the privilege applies. If the objection is overruled, the party or witness is ordered to answer or respond; if the objection is sustained, the question or request goes unanswered.

But what if the inquiring party somehow obtains an answer to the inquiry *before* the court has an opportunity to rule on the privilege question, and it is later determined that the privilege applies such that the objection would have been sustained? In many instances, the only available remedy that will preserve the integrity of the process and public respect for the administration of justice would be to disqualify counsel for the inquiring party in conjunction with ordering return of privileged documents and/or sealing of transcripts. Does it make a difference, however, if the answer obtained by the inquiring party included no information likely to affect the ongoing litigation? To put it another way, is disqualification of counsel necessarily the remedy even if the violation of the attorney-client privilege resulted in no actual disclosure of relevant information?

In this case, as part of an internal affairs investigation regarding the unauthorized disclosure of a confidential police report, the San Diego Police Department (Department) questioned plaintiff/real party Dana Hoover, a detective for the Department, regarding the content of communications between Hoover and an attorney representing her in an employment-related lawsuit against defendant/petitioner City of San Diego. Although

2

Hoover invoked the privilege, the Department directed her to answer the internal affairs questions or face discipline and/or termination of employment. The trial court properly concluded that the City violated the attorney-client privilege when Department investigators insisted Hoover respond to questions despite her invocation of the privilege. A deputy city attorney attending the interview as an observer also violated the California State Bar Rules of Professional Conduct when she began questioning Hoover about her lawsuit without the permission of her lawyer in the case (Rules Prof. Conduct, rule 2-100).[1]

Disqualification of counsel, however—particularly the elected City Attorney—is a drastic remedy that should be ordered only where the violation of the privilege or other misconduct has a "substantial continuing effect on future judicial proceedings." (*Gregori v. Bank of America* (1989) 207 Cal.App.3d 291, 309 (*Gregori*).) There must be a "reasonable probability" and "genuine likelihood" that opposing counsel has "obtained information the court believes would likely be used advantageously against an adverse party during the course of the litigation." (*Ibid.*) Here, the transcript of the internal affairs interview[2] demonstrates that although relevant confidential information could in theory have been elicited in response to the internal affairs questions, in fact no such information was disclosed. Under these circumstances, because "a disqualification order must be prophylactic, not punitive" (*id.* at pp. 308–309), the drastic remedy of depriving

---

[1]     All further rule references are to the California State Bar Rules of Professional Conduct unless otherwise indicated.

[2]     Filed under seal with both the trial court and this court.

3

a party of its counsel of choice was unwarranted. We therefore issue the writ as requested by the City.

## FACTUAL AND PROCEDURAL BACKGROUND

In May 2014 Hoover filed a lawsuit against the City, her employer, alleging claims of employment-related harassment and retaliation. In particular, she claimed she suffered harassment and retaliation based on complaints she made about perceived investigative failures by the Department's homicide unit, of which she had been a member. In June 2015, Hoover was represented in her lawsuit by attorney Daniel M. Gilleon.

In late 2017, Gilleon agreed to represent a different client—the mother of a minor sexual assault victim—in a separate claim against the City. On behalf of this new client, Gilleon alleged that the Department failed to properly investigate the assault and then covered it up. Media outlets reported the claim. In particular, a March 2018 article in the Voice of San Diego referenced a "police report" obtained by the Internet news service.

The Voice of San Diego article prompted an investigation by the Department's internal affairs unit seeking to determine if and how the media obtained a confidential police investigative report. Suspicion focused on Hoover, and investigators scheduled an interview with her to determine whether she was the source of the leak. An initial interview was conducted by Sergeants Robert Gassman and John Huys on March 14, 2018. Hoover was accompanied by her union representative, Officer Mark Brenner. She was ordered to respond to the investigators' questions and was told at the outset that any

4

refusal to answer could be treated as insubordination, subjecting her to discipline up to and including termination.

Although she had no involvement in the sexual assault case, Hoover admitted to accessing and reviewing the report.  She denied, however, providing the report to or discussing its contents with anyone.  At some point the investigators began to inquire about communications between Hoover and Gilleon.  Brenner objected based on the attorney-client privilege.  Recalling the earlier threats of discipline if she failed to cooperate, Hoover nonetheless began answering the questions.[3]  Brenner again objected and advised Hoover not to answer any further questions about the content of communications with her lawyer.  At that point the investigators took a break and contacted their supervisor; when the questioning resumed they did not make any further inquiries about communications with Gilleon.

Later that same day, Sergeant Huys contacted Hoover, telling her that the City Attorney's office had concluded that the attorney-client privilege did not preclude questions about her conversations with attorney Gilleon as they related to the sexual assault investigation and the leaked police report.  Hoover was ordered to return for a follow-up interview on March 22.

---

[3]     Hoover's declaration is unclear in describing how she responded on March 14, if at all, to questions regarding the content of any communications with Gilleon.  Gilleon's later e-mail to the deputy city attorney on the case indicates that Hoover "rightfully refused" to answer any such questions.  Nothing in the transcript of the March 22 interview suggests that any confidential communication was revealed on March 14.

Meanwhile Gilleon learned of the internal affairs investigation and on March 16 sent an e-mail to Deputy City Attorney Michael J. McGowan complaining about the alleged violation of the attorney-client privilege. McGowan responded that he had just "inherited" the case from another attorney, but based on "very limited information" he did not believe the questions were sufficiently "related to the lawsuit." He nonetheless offered to meet with Gilleon before the rescheduled interview to discuss the matter. Gilleon sent another e-mail, this time also copying the San Diego City Attorney Mara Elliot, warning that if the City proceeded to question Hoover about conversations she had with Gilleon, he would "take immediate legal action including but not limited to not limited to: 1) restraining orders; 2) sanctions motion; 3) motion to disqualify; and 4) a report to the State Bar." Neither Gilleon nor the City made any attempt to seek input or guidance from the trial court.

Hoover's interview with the same two internal affairs investigators resumed on March 22. Hoover was accompanied by attorney Rick Pinckard, counsel provided by the police officers' association. Deputy City Attorney Christina Milligan observed the interview but also engaged with Pinckard in occasional discussions of legal issues regarding the attorney-client privilege.

A transcript of that interview has been filed under seal and is part of the record.[4] In it Hoover described receiving a group text message from Gilleon that referred to the sexual assault investigation. She later contacted him by phone about a different issue, but

---

[4]     Here we refer to the sealed transcript only for the purpose of describing facts that do not involve potentially privileged communications between Hoover and her attorney.

6

the sexual assault investigation came up during the discussion. Later, Hoover decided to look at the police report concerning the sexual assault incident out of "professional curiosity." She printed a copy, read the report, then immediately placed it in a "secured shred bin." She specifically denied giving a copy of the report to anyone or discussing its contents with anyone, including any member of the press.

When the investigators sought to inquire about the content of the phone conversation with Gilleon that preceded Hoover accessing the report, Pinckard reasserted the attorney-client privilege. In response to a clarifying question by Deputy City Attorney Milligan, Hoover stated that her lawsuit against the City "absolutely" dealt with claims of negligent investigation and a failure to properly investigate. Milligan followed up by asking whether the sexual assault investigation was "encompassed" in Hoover's case, to which she replied, "No." But Pinckard then pointed out that "how that claim might in some way support or relate to the claims that are asserted in her action and any discussions that she's had with her attorney . . . regarding how this incident may or may not fit into that litigation, that would be privileged."

The questioning by the internal affairs officers resumed. Hoover denied giving Gilleon any information about the sexual assault case. Sergeant Huys pressed her for details of what information Gilleon provided her during the conversation. Hoover summarized what she recalled Gilleon telling her, but admitted she had learned a great deal about the sexual assault case from "media reports" and could not be sure which details she first learned from Gilleon. Huys then asked if and how the sexual assault investigation was related to her case against the City.

7

Within a few weeks of the March 22 interview, Hoover filed a motion to disqualify the City Attorney in her harassment and retaliation action. The motion claimed that the internal affairs interview violated both the attorney-client privilege and Rule 2-100, which generally prohibits a lawyer from contacted a litigant known to be represented by counsel. According to Hoover's motion, the only appropriate remedy was disqualification of the entire Office of the City Attorney.

The trial court agreed. It found that the City and the City Attorney's office "(1) forced plaintiff to reveal confidential attorney-client communications, and (2) communicated with plaintiff about the subject matter of the litigation without her counsel's consent." The court rejected the City's argument that the privilege was not violated because the disclosed communications between Gilleon and Hoover did not relate to the lawsuit, noting that a court " 'may not review the contents of a communication to determine whether the attorney-client privilege protects that communication.' " (*DP Pham*, *LLC v. Cheadle* (2016) 246 Cal.App.4th 653, 659.)

Relying on cases involving the inadvertent disclosure and receipt of privileged information, the court noted that disqualification is often necessary as a prophylactic rule. In this case, however, the receipt of privileged information was not inadvertent. Indeed, the court noted, it would have been a simple matter for the City to have raised the issue with the court in an ex parte application *before* the resumed March 22 interview. Under these circumstances, disqualification was warranted "to preserve the public's trust in the integrity of the judicial process and to prevent future prejudice to the plaintiff."

After the City filed a petition for writ of mandate/prohibition, we issued an order to show cause.

## DISCUSSION

In addressing this writ petition we face two separate issues. First, did the investigators' interview of Hoover invade the attorney-client privilege? A corollary inquiry is whether the deputy city attorney present at the March 22 interview violated Rule 2-100 by communicating with Hoover about the subject of her lawsuit against the City without the consent of her attorney Gilleon? Second, if the answer to either or both of these preliminary questions is "yes," does the transgression require disqualification of the Office of the City Attorney?

1.a. *Forcing Hoover to divulge the contents of a conversation with her attorney violated the attorney-client privilege.*

As codified in Evidence Code section 954, the attorney-client privilege protects from disclosure confidential communications between lawyer and client.[5] (*Los Angeles County Bd. of Supervisors v. Superior Court* (2016) 2 Cal.5th 282, 292 (*Los Angeles County Bd.*).) A "confidential communication" in this regard "means information transmitted between a client and his or her lawyer in the course of that relationship and in confidence . . . ." (§ 952.) It "includes a legal opinion formed and the advice given by the lawyer in the course of that relationship." (*Ibid.*)

"The party claiming the privilege has the burden of establishing the preliminary facts necessary to support its exercise, i.e., a communication made in the course of an

---

[5]     All statutory references are to the Evidence Code unless otherwise indicated.

9

attorney-client relationship."  (*Costco Wholesale Corp. v. Superior Court of San Francisco* (2009) 47 Cal.4th 725, 733 (*Costco*).  Where there are conflicting facts, we will affirm a trial court's finding if it is supported by substantial evidence.  (*D. I. Chadbourne*, *Inc. v. Superior Court of San Francisco* (1964) 60 Cal.2d 723, 729.)  Once the party claiming the privilege "establishes facts necessary to support a prima facie claim of privilege, the communication is presumed to have been made in confidence and the opponent of the claim of privilege has the burden of proof to establish the communication was not confidential or that the privilege does not for other reasons apply."  (*Costco*, at p. 733; § 917, subd. (a).)

Here, there is no dispute that Gilleon had an attorney-client relationship with Hoover.  Indeed, Hoover told the investigators during the interview that Gilleon had been her attorney for three years at the time of the phone call.  She stated that she called Gilleon to discuss something.  As the trial court found, this was sufficient to meet Hoover's initial burden of establishing that the discussion in the ensuing phone call was "in the course of" the attorney-client relationship.  The burden then shifted to the City to show that the privilege did not apply.

Hoover does not object to questions by the investigators about the initial group text from Gilleon that mentioned the sexual assault investigation.  Although this was clearly a "communication between client and lawyer" (§ 954), it was presumably not "confidential" because Hoover knew it was shared with a number of other individuals. (See § 952 [communication is made "in confidence" if transmitted "by a means which, so far as the client is aware, discloses the information to no third persons . . . ."].)  She

10

instead focuses on the investigators' inquiries regarding her subsequent phone call to Gilleon.

The trial court correctly concluded that when the two sergeants from the internal affairs division questioned Hoover over her objection about the content of her phone conversation with Gilleon, they invaded the attorney-client privilege both procedurally and substantively. Procedurally, when the attorney-client privilege is invoked, questions concerning the applicability of the privilege require a hearing *by the court* before the allegedly confidential communication is disclosed to the opposing party. (See *Titmas v. Superior Court* (2001) 87 Cal.App.4th 738, 740.) Here, as the trial judge noted, it was not for the Department or the City Attorney to determine unilaterally whether the privilege applied. That was a task for the court to perform, and the court had ex parte procedures in place to address precisely this type of time-sensitive matter. When a facially colorable claim of privilege was raised, the internal affairs questioning on that topic should have been suspended until the matter could be raised with the court. Indeed, that appears to have happened during the initial interview on March 14. There was more than sufficient time between that date and the resumed questioning on March 22 for the City Attorney to have brought the matter to the court's attention on its ex parte calendar and obtained a ruling as to the applicability of the privilege.

Substantively as well, the City's approach to the privilege issue is flawed. The City relies primarily on the fact that Gilleon's initial group text was sent to third parties as support for the proposition that the entire subject of the sexual assault investigation was never intended to be confidential. The fact that the sexual assault case was first discussed

11

in a group text certainly suggests that the text itself was not confidential, but it hardly follows that Hoover's subsequent private conversation with Gilleon was not in confidence. In this regard it is significant that the text was sent by Gilleon, but the phone call was initiated by Hoover to discuss something other than the sexual assault case.

It is unclear whether and, if so, how the sexual assault investigation was connected to Hoover's harassment and retaliation case. But the fact that it plausibly *could be* is enough because the burden is on the City to show that a communication made in the course of an attorney-client relationship was not privileged. While the purpose for Hoover's phone call to Gilleon was, appropriately, not disclosed, there is no evidence they were exchanging recipes or movie recommendations. Their relationship was attorney and client; they had no other relationship. In deciding whether a communication is privileged, it is well settled that we do not require disclosure of the assertedly privileged statements. (§ 915, subd. (a); see *Costco*, *supra*, 47 Cal.4th at pp. 737, 739.) And plainly, as the trial court observed, it is not for the opposing party to compel disclosure of the attorney-client communications in order to determine whether *it* believes the privilege properly applies.[6]

At the internal affairs interview Deputy City Attorney Milligan took the position that she was entitled to inquire into whether and how the sexual assault investigation was

---

6    This is not a situation where the character of the attorney-client communication itself reveals it was not made "for the purpose of legal consultation." (*Los Angeles County Bd.*, *supra*, 2 Cal.5th 282, 295 [billing invoices].) Here, Hoover made a phone call for the purpose of consulting her attorney.

12

related to or "encompassed in" Hoover's lawsuit against the City. But this is precisely the type of inquiry the privilege is designed to preclude. A client may not know why a lawyer is relating certain information or asking a particular question. She may not perceive how the information or her answers will further her case. Yet the information and the question may reveal something about the lawyer's litigation strategy. The attorney-client privilege places the contents of these lawyer-client discussions presumptively off limits to opposing counsel absent a showing that the privilege does not apply. The City made no such showing here.

1.b. *The Rules of Professional Conduct precluded the deputy city attorney from directly questioning Hoover during the interview without the consent of attorney Gilleon.*

At the outset of the March 22 interview, Sergeant Huys introduced the participants, including attorney Pinckard representing Hoover for purposes of the interview. Huys also introduced Deputy City Attorney Milligan and a legal intern from the City Attorney's office, but indicated they "are here only as observers." He added, "[O]nly Internal Affairs Detective Sergeant Gassman and I will direct any questions to Detective Hoover."

During the course of the interview, however, attorney Milligan asked several questions of Hoover. Prior to the interview no one in the City Attorney's office contacted

13

attorney Gilleon and obtained his consent. Nor did Milligan ask permission of attorney

Pinckard before asking the questions.[7]

The Rules of Professional Conduct govern the conduct of members of the State

Bar of California. Nothing in those rules affected the ability of the Department to

question Hoover about the suspected unauthorized disclosure to the press of a

confidential police report. But the lawyers employed by the City Attorney's office are a

different matter. They, like other members of the California State Bar, are bound by the

Rules of Professional Conduct. Rule 2-100(A) provides: "While representing a client, a

member shall not communicate directly or indirectly about the subject of the

representation with a party the member knows to be represented by another lawyer in the

matter, unless the member has the consent of the other lawyer."

By terms of Rule 2-100, Milligan could not communicate "directly or indirectly"

with Hoover about anything having to do with her lawsuit against the City unless she first

obtained consent from attorney Gilleon, who represented her in that lawsuit. Here,

although it was represented she was only present as an observer, Milligan took over

questioning at one point in the interview, making several inquiries about the scope of

Hoover's claims in her lawsuit. These questions were indisputably "about the subject of

[Gilleon's] representation," yet Gilleon's permission was never obtained and he was never

consulted. Although we appreciate that Milligan may only have been trying to expedite

---

7     Even if there was such a request, Rule 2-100 requires consent by the "other lawyer," i.e., the lawyer representing the client in the underlying litigation. Here, there is no dispute that Gilleon was Hoover's lawyer in her action against the City.

14

the interview process, her direct questioning of Hoover—rather than pausing to advise Huys and Gassman—violated Rule 2-100.

2. *Because there is no reasonable likelihood that the misconduct in this case will give the City any unfair advantage, disqualification of the City Attorney is not appropriate.*

Having determined that both the attorney-client privilege and Rule 2-100 were violated, the critical question is whether these errors, singly or taken together, require or permit disqualification of the City Attorney's office. A court's authority to disqualify a lawyer in a pending proceeding derives from its inherent power to regulate the conduct of court officers, including attorneys, in furtherance of the sound administration of justice. (*City and County of San Francisco v. Cobra Solutions*, *Inc.* (2006) 38 Cal.4th 839, 846 (*Cobra Solutions*); Code Civ. Proc., § 128, subd. (a)(5).) Although the right to counsel of one's choice is an important one, it "must yield to ethical considerations that affect the fundamental principles of our judicial process." (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems*, *Inc.* (1999) 20 Cal.4th 1135, 1145.)

At the same time, courts have recognized that a disqualification order is not without cost. "[I]t must be kept in mind that disqualification usually imposes a substantial hardship on the disqualified attorney's innocent client, who must bear the monetary and other costs of finding a replacement." (*Gregori*, *supra*, 207 Cal.App.3d at p. 300.) And there are additional and different costs when the disqualified attorney is a public law office, such as the popularly elected San Diego City Attorney in this case. "When an entire government law office is disqualified, the government inevitably incurs the added cost of retaining private counsel [citation], the delay such substitution entails,

15

and in certain types of litigation it may also lose the specialized expertise of its in-house attorneys, hampering its ability to protect the public's interest." (*Cobra Solutions*, *supra*, 38 Cal.4th at p. 851.)

Deciding whether disqualification is the appropriate remedy thus involves a delicate balancing of competing policy considerations. Where the trial court weighs the proper factors, the resulting decision on a motion to disqualify counsel is generally reviewed for abuse of the court's discretion. (*La Jolla Cove Motel & Hotel Apartments, Inc. v. Superior Court* (2004) 121 Cal.App.4th 773, 782.) But where, as here, there are no material factual disputes, we review the decision to disqualify counsel as a question of law. (*Cobra Solutions*, *supra*, 38 Cal.4th at p. 848.)

We do not disqualify a lawyer from representing a client to punish the lawyer's mistakes or even bad behavior. (*Neal v. Health Net, Inc.* (2002) 100 Cal.App.4th 831, 844; *Gregori*, *supra*, 207 Cal.App.3d at p. 309 [not every instance of unprofessional conduct or bad judgment by an attorney warrants disqualification].) The discipline of lawyers in California is a function reserved to the State Bar. (*Myerchin v. Family Benefits, Inc.* (2008) 162 Cal.App.4th 1526, 1538, disapproved on a different ground in *Village Northridge Homeowners Assn. v. State Farm Fire & Casualty Co.* (2010) 50 Cal.4th 913, 929, fn. 6; see also *Gregori*, at p. 309.) Rather, disqualification of counsel is a prophylactic remedy designed to mitigate the unfair advantage a party might otherwise obtain if the lawyer were allowed to continue representing the client. (*Clark v. Superior Court* (2011) 196 Cal.App.4th 37, 55.)

16

As early as its decision in *Chronometrics, Inc. v. Sysgen, Inc.* (1980) 110 Cal.App.3d 597, the court was able to "detect a common theme" in California disqualification cases:  "If the status or misconduct which is urged as a ground for disqualification will have a continuing effect on the judicial proceedings which are before the court, it is justified in refusing to permit the lawyer to participate in such proceedings. . . .  If, on the other hand, the court's purpose is to punish a transgression which has no substantial continuing effect on the judicial proceedings to occur in the future, neither the court's inherent power to control its proceedings nor Code of Civil Procedure section 128 can be stretched to support the disqualification."  (*Id.* at p. 607.)

This theme was amplified and explicated in *Gregori*, which has become one of the seminal California decisions addressing these issues.  In that case, one of plaintiff's attorneys initiated a "social relationship" with a secretary employed by a law firm representing the defendants.  (207 Cal.App.3d at p. 295.)  The secretary admitted discussing " 'personalities involved in the litigation' " but denied disclosing any confidential information.  (*Id.* at p. 296.)  The trial court denied the motion to disqualify plaintiff's counsel.  Although it characterized the conduct of the plaintiff's attorney as " 'the essence of unprofessionalism and poor judgment,' " it ultimately concluded there was no evidence to suggest plaintiff " 'might gain any unfair advantage' " as a result of the contact between the attorney and the secretary.  (*Id.* at p. 299.)

The Court of Appeal in *Gregori* affirmed.  After acknowledging the competing policy considerations that must be balanced when a motion to disqualify counsel is brought (207 Cal.App.3d at pp. 300–301), Justice Kline's opinion explained that the

17

prophylactic nature of the disqualification remedy means the focus of the analysis must be on "whether there exists a genuine likelihood that the status or misconduct of the attorney in question will affect the outcome of the proceedings before the court." (*Id.* at p. 309.) "Thus, disqualification is proper where, as a result of a prior representation or through improper means, there is a reasonable probability counsel has obtained information the court believes would likely be used advantageously against an adverse party during the course of the litigation. . . . Disqualification is inappropriate, however, simply to punish a dereliction that will likely have no substantial continuing effect on future judicial proceedings. [Citation.] There are other sanctions which in that situation must suffice, including imposition of attorneys fees and costs incurred by the other side as a result of the misconduct (Code Civ. Proc., § 128) and reporting of the misconduct to the State Bar of California so that it may determine whether disciplinary action is appropriate . . . ." (*Ibid.*)

*Gregori* and the "substantial continuing effect" inquiry has been regularly cited as the proper standard in addressing a request to disqualify counsel in a variety of contexts. (See, e.g., *California Self-Insurers' Security Fund v. Superior Court* (2018) 19 Cal.App.5th 1065, 1079; *McDermott Will & Emery LLP v. Superior Court* (2017) 10 Cal.App.5th 1083, 1120; *In re Marriage of Murchison* (2016) 245 Cal.App.4th 847, 852; *Oaks Management Corporation v. Superior Court* (2006) 145 Cal.App.4th 453, 467; *Hetos Investments, Ltd. v. Kurtin* (2003) 110 Cal.App.4th 36, 49; *Cal Pak Delivery, Inc. v. United Parcel Service, Inc.* (1997) 52 Cal.App.4th 1, 12.) Under this test, there must be a "genuine likelihood" that the attorney's status or misconduct "will affect the outcome

18

of the proceedings before the court." (*Gregori*, *supra*, 207 Cal.App.3d at p. 309; accord *Kennedy v. Eldridge* (2011) 201 Cal.App.4th 1197, 1205.)

This case presents a somewhat unique set of circumstances. Unlike some others (compare *In re Complex Asbestos Litigation* (1991) 232 Cal.App.3d 572, 592), here we know exactly what was and was not disclosed when the City elected to question Hoover regarding her phone call with attorney Gilleon. We have the transcript of the March 22 interview. Reviewing that transcript, there is nothing Hoover said during the interview that could "likely be used advantageously against" her in her case against the City. (*Gregori*, *supra*, 207 Cal.App.3d at p. 309.) Hoover told the investigators she gave Gilleon no information about the sexual assault case. And although she acknowledged that Gilleon provided her with some information, she could not specifically identify what that information was because she had learned so many more details from the public press, particularly the Voice of San Diego article.

Hoover cites the principle that we cannot generally look at the contents of a communication to determine whether it is privileged. (*Costco*, *supra*, 47 Cal.4th at p. 739.) Here, however, we are not looking at the transcript to decide if the privilege applied. We have already concluded that it did. Rather we are reviewing facts known to all the relevant parties—Hoover, the City and the trial court—to determine whether any information disclosed during the interview will have a "substantial continuing effect on future judicial proceedings." (*Gregori*, *supra*, 207 Cal.App.3d at p. 309.) Under these circumstances, we can confidently say there is no "reasonable probability" or "genuine

19

likelihood" that the City's misconduct will provide it with an unfair advantage or in any other way "affect the outcome of the proceedings before the court."[8] (*Ibid.*)

## DISPOSITION

Let a writ of mandate issue directing the respondent court to vacate its order granting Hoover's motion to disqualify the San Diego City Attorney and enter a new order denying the motion. The stay issued May 11, 2018 will be vacated when the opinion is final as to this court. In the interests of justice, each party shall bear its own costs.

DATO, J.

WE CONCUR:

HUFFMAN, Acting P. J.

HALLER, J.

---

[8] We express no opinion on potential sanctions or other responses to the City's conduct in this case that the trial court may wish to consider.

20