[No. C066697. Third Dist. Dec. 13, 2011.]

KAYLA JEAN KENNEDY, Plaintiff and Respondent, v.
TYLER SCOTT ELDRIDGE, Defendant and Appellant.

**COUNSEL**

Richard A. Eldridge for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

**OPINION**

**BUTZ, J.**—In a roiling support and custody dispute involving an infant child, did the trial court act within its discretion in disqualifying the child's paternal grandfather from representing his son, the father, against the mother of his grandson?

We hold that it did. A plethora of family entanglements, potential misuse of confidential information, a conflict posed by the near-certain prospect that counsel will have to testify, and the preservation of the integrity of the judicial system all coalesce to support the trial court's disqualification order.

Appellant Tyler Scott Eldridge (Tyler) appeals from an order of the family court granting the motion of plaintiff and respondent Kayla Jean Kennedy (Kayla) to disqualify Tyler's father, Richard Eldridge (Richard), from representing Tyler in this action involving the custody and support of Calvin Kennedy-Eldridge (Calvin), who is the child of Tyler and Kayla.[1]

Tyler argues the disqualification order was erroneous because (1) Kayla was not a former client of Richard's and thus lacked standing to bring the

---

[1] We use the parties' first names to avoid confusion generated by common surnames. No disrespect is intended.

motion; (2) Richard's firm did not acquire confidential information as a result of its representation of Kayla's father in an earlier family law case; and (3) the trial court misapplied the attorney-witness rule in concluding that Richard had a nonwaivable conflict of interest.

We find none of these arguments persuasive and shall affirm the trial court's order.

## FACTUAL BACKGROUND

*The Birth of Calvin and Commencement of Litigation*

Kayla is a recent graduate from college and Tyler is a college student. In November 2009, while the parties were in a dating relationship, Kayla learned she was pregnant. Each party was then living with his or her respective parents.[2]

The parties' son Calvin was born in June 2010 (all further calendar dates are to that year). In July, Kayla filed a petition to establish paternity, and requested custody and support. She alleged that the parties were "close to a full agreement" regarding visitation, but she was troubled by Tyler's apparent use of marijuana.

Richard, acting as attorney for his son Tyler, filed a response to the petition, admitting paternity and requesting a visitation schedule.

The litigation quickly deteriorated into bitterness and acrimony. Tyler claimed that the air in Kayla's home was "fresh and thick" with the smell of marijuana during his visits with Calvin. In Kayla's reply, she alleged that everyone in Tyler's household except Richard regularly smoked marijuana. She requested supervised visitation due to Tyler's volatile personality, "drug" and "party" lifestyle, and highly inappropriate behavior during his visits with Calvin. Tyler and Kayla filed declarations accusing each other of behaving erratically and suffering from mental instability. Each made serious charges against the other's family.

*The Motion to Disqualify*

On September 7, Kayla brought a motion to recuse Richard from representing Tyler in the action. In her supporting declaration, Kayla alleged (1) Richard and his wife, Deborah Eldridge (Deborah), practiced law together

---

[2] Kayla subsequently moved in with a roommate, while Tyler continued to reside in his parents' household.

and represented Kayla's father in his divorce case in Placer County; (2) during that representation both Eldridges consulted with Kayla's stepmother; (3) at Deborah's request, Kayla prepared declarations supporting her father in the divorce case; (4) Kayla herself once worked as a process server for the Eldridge firm; and (5) as a result of the foregoing, Richard has access to Kayla's confidential information. Kayla also stated that since the day she told them she was pregnant, both Richard and Deborah have been "emotionally involved" in their new grandson's legal case.

Tyler filed a declaration in opposition to the motion, contending that Kayla had brought the motion for an improper purpose. Richard filed points and authorities requesting that the motion to disqualify him be denied and asking that sanctions be imposed on Kayla's counsel for bringing it. The opposition claimed that Kayla's motion was procedurally defective, that she lacked standing to bring the motion because she was not a former client and that Richard owed Kayla no duty of loyalty or confidentiality that would be breached by his continued representation of his son.

On October 6, the motion was heard before Sacramento County Judge James M. Mize. Although no formal testimony was taken at the hearing, Richard, Kayla and Kayla's attorney made factual representations to the court. Richard conceded that his wife Deborah, with whom he practiced law had, in 2006, represented Kayla's father, Alan Kennedy, in a child custody dispute. Richard also admitted that Kayla had, at the firm's request, submitted a declaration on her father's behalf in that proceeding. However, Richard was adamant that Kayla had prepared the declaration herself, that she had never been a client of the Eldridge firm, and that she was never the firm's employee. Kayla told the court that it was her stepmother, Megan O'Hara Kennedy (Deborah's secretary), who advised her to write a declaration to be filed in her father's case. She said she submitted her declaration to Megan (who had worked at the Eldridge law office for six years), who then gave it to Deborah.

On November 10 the trial court granted Kayla's motion, ordering Richard's removal as attorney for Tyler. In its written ruling, the court found that Kayla had standing to bring the motion even though she had not been a client of Richard or his law firm; that Richard's dual role as witness and advocate compromised his ethical duty to maintain the integrity of the judicial process; and that the best interest of Calvin required that Richard not be put in the unseemly role of advocate for his son against the child's mother in a case involving custody and support. Tyler filed a timely notice of appeal from this order.

## DISCUSSION

### I. No Respondent's Brief

Kayla has not filed a respondent's brief in this case. However, we do not treat the failure to file a respondent's brief as a "default" (i.e., an admission of error) but independently examine the record and reverse only if prejudicial error is found. (*In re Bryce C.* (1995) 12 Cal.4th 226, 232–233 [48 Cal.Rptr.2d 120, 906 P.2d 1275]; *In re Marriage of Riddle* (2005) 125 Cal.App.4th 1075, 1078, fn. 1 [23 Cal.Rptr.3d 273].)

### II. Standard of Review

An order granting or denying a disqualification motion is an appealable order (*Meehan v. Hopps* (1955) 45 Cal.2d 213, 215 [288 P.2d 267]; *A.I. Credit Corp., Inc. v. Aguilar & Sebastinelli* (2003) 113 Cal.App.4th 1072, 1077 [6 Cal.Rptr.3d 813]) and is reviewed for abuse of discretion (*Federal Home Loan Mortgage Corp. v. La Conchita Ranch Co.* (1998) 68 Cal.App.4th 856, 860 [80 Cal.Rptr.2d 634] (*Federal Home Loan*)). The trial court's ruling is presumed correct (*H. F. Ahmanson & Co. v. Salomon Brothers, Inc.* (1991) 229 Cal.App.3d 1445, 1451 [280 Cal.Rptr. 614]) and reversal is permissible "only when there is no reasonable basis for the trial court's decision" (*Federal Home Loan*, at p. 860). We accept as correct all of the court's express or implied findings that are supported by substantial evidence. (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1143 [86 Cal.Rptr.2d 816, 980 P.2d 371] (*SpeeDee*).)

"In viewing the evidence, we look only to the evidence supporting the prevailing party. [Citation.] We discard evidence unfavorable to the prevailing party as not having sufficient verity to be accepted by the trier of fact. [Citation.] Where the trial court has drawn reasonable inferences from the evidence, we have no power to draw different inferences, even though different inferences may also be reasonable." (*Federal Home Loan, supra,* 68 Cal.App.4th at p. 860.)

### III. Standing

Tyler's initial claim is that the trial court erred in granting the disqualification motion because it was not brought by a client or former client of Richard's. Pointing out that the trial court found that Kayla had *not* been a client of the Eldridge firm during her father's family law dispute, Tyler contends Kayla lacked standing to bring the motion. According to Tyler, since Kayla had never been a client, Richard owed her no duty of confidentiality and therefore had no conflict of interest in representing Tyler.

█ The assertion that Kayla lacked standing to bring the motion is incorrect. As the trial court noted in its written ruling, no California case has held that only a client or former client may bring a disqualification motion. The reason is simple: " 'A trial court's authority to disqualify an attorney derives from the power inherent in every court "[t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto." [Citations.]' [Citations.] '[D]isqualification motions involve a conflict between the clients' right to counsel of their choice and the need to maintain ethical standards of professional responsibility. [Citation.] The paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar. The important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process.' " (*Great Lakes Construction, Inc. v. Burman* (2010) 186 Cal.App.4th 1347, 1355 [114 Cal.Rptr.3d 301] (*Burman*), fn. omitted, quoting *SpeeDee*, *supra*, 20 Cal.4th at pp. 1145–1146.)

Consequently, while federal courts generally limit standing to bring disqualification motions to clients or former clients (see Vapnek et al., Cal. Practice Guide: Professional Responsibility (The Rutter Group 2010) ¶ 4:322.12), in California "where the ethical breach is ' "manifest and glaring" ' and so 'infects the litigation in which disqualification is sought that it impacts the moving party's interest in a just and lawful determination of [his or] her claims' [citation], a nonclient might meet the standing requirements to bring a motion to disqualify based upon a third party conflict of interest or other ethical violation." (*Burman*, *supra*, 186 Cal.App.4th at p. 1357, quoting *Colyer v. Smith* (C.D.Cal. 1999) 50 F.Supp.2d 966, 971–972.) Case law abounds with examples of orders disqualifying counsel that have not been the product of motions by present or former clients. (See, e.g., *Meza v. H. Muehlstein & Co., Inc.* (2009) 176 Cal.App.4th 969, 980–981 [98 Cal.Rptr.3d 422] (*Meza*) [law firm disqualified after hiring attorney who was privy to adversary's privileged work product information]; *People v. Peoples* (1997) 51 Cal.App.4th 1592, 1599 [60 Cal.Rptr.2d 173] (*Peoples*) [defense attorney with direct familial connections to victim, witnesses and the defendant disqualified on court's own motion]; *Woods v. Superior Court* (1983) 149 Cal.App.3d 931, 937 [197 Cal.Rptr. 185] [in a divorce action, court properly granted wife's motion to disqualify counsel for husband who had formerly represented the family business]; see also *DCH Health Services Corp. v. Waite* (2002) 95 Cal.App.4th 829, 832 [115 Cal.Rptr.2d 847] ["Standing arises from a breach of the duty of confidentiality owed to the complaining party, regardless of whether a lawyer-client relationship existed."].)

█ It makes no sense for a court to stand idly by and permit conflicted counsel to participate in a case merely because neither a client nor former

client has brought a motion. As one court put it, "Protection of the attorney-client privilege is not the *only* ground for a motion to disqualify an attorney." (*Meza, supra*, 176 Cal.App.4th at p. 980.) "[T]he court has an *independent interest* in ensuring trials are conducted within ethical standards of the profession and that legal proceedings appear fair to all that observe them." (*In re A.C.* (2000) 80 Cal.App.4th 994, 1001 [96 Cal.Rptr.2d 79], italics added.) Accordingly, we conclude that where an attorney's continued representation threatens an opposing litigant with cognizable injury or would undermine the integrity of the judicial process, the trial court may grant a motion for disqualification, regardless of whether a motion is brought by a present or former client of recused counsel.

We therefore turn to the merits of the trial court's order. For reasons we shall explain, an amalgamation of interrelated factors supports the disqualification of Richard.

### IV. Potential Misuse of Confidential Information

"[W]hen no attorney-client relationship exists '[m]ere exposure to the confidences of an adversary does not, standing alone, warrant disqualification.' " (*Oaks Management Corp. v. Superior Court* (2006) 145 Cal.App.4th 453, 467 [51 Cal.Rptr.3d 561], quoting *In re Complex Asbestos Litigation* (1991) 232 Cal.App.3d 572, 589 [283 Cal.Rptr. 732].) However, disqualification may be considered where " 'there exists *a genuine likelihood that the status or misconduct of the attorney in question will affect the outcome of the proceedings before the court.* Thus, disqualification is proper where, as a result of a prior representation or through improper means, there is a reasonable probability counsel has obtained information the court believes would likely *be used advantageously against an adverse party during the course of the litigation.*' " (*Oaks Management*, at p. 467.)

Although the trial court found that Kayla was not a former client of the Eldridge firm, it did *not* find that the firm had no exposure to confidential information about her. On the contrary, the trial court was very troubled by the fact that the Eldridges may have acquired confidential facts about her and her family's situation that could be used to Tyler's advantage.[3] Not only did the firm represent Kayla's father, Kayla herself had filed a declaration in his case at the request of her stepmother Megan, who was a secretary at the Eldridge firm.

---

[3] The fact that it was technically Deborah and not Richard who represented Kayla's father is immaterial. Under the vicarious disqualification doctrine, the taint of an ethical conflict that affects one attorney extends to his or her entire law firm. (*Adams v. Aerojet-General Corp.* (2001) 86 Cal.App.4th 1324, 1333 [104 Cal.Rptr.2d 116] (*Adams*).)

While we have found no California case precisely governing this situation, we have located one that contains an analogous fact pattern, which analysis we find useful here: In *Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft* (1999) 69 Cal.App.4th 223 [81 Cal.Rptr.2d 425] (*Morrison*), Centennial Engineering (Centennial), a wholly owned subsidiary of Morrison Knudsen Corporation (Morrison Knudsen), contracted with a water district (district) to provide engineering services on a dam project. The Hancock law firm had represented Morrison Knudsen in the 1980's and currently acted as "monitoring counsel" for Morrison Knudsen, overseeing defense attorneys retained by Morrison Knudsen's underwriters to defend insurance claims. (*Morrison*, at p. 227.) In the course of these duties, Hancock received confidential information about the progress of the cases and Morrison Knudsen's potential liability on the claims. (*Id.* at pp. 226–227.)

Over Morrison Knudsen's and Centennial's objections, Hancock agreed to act as special counsel for the district to investigate potential claims against Centennial in connection with the project. (*Morrison, supra,* 69 Cal.App.4th at p. 228.) When the firm refused to withdraw voluntarily, the parent and subsidiary companies moved for a preliminary injunction preventing the Hancock firm from representing the district. (*Id.* at pp. 228–229.) Despite its finding that Centennial had never been a client of Hancock's, the trial court disqualified the firm from acting as counsel for the district. (*Id.* at pp. 229, 253.)

█ In affirming the order, the Court of Appeal, First Appellate District, Division Four, admitted the case was " 'a square peg which does not fit into the round holes of the rules most commonly applied in attorney disqualification cases.' " (*Morrison, supra,* 69 Cal.App.4th at p. 230, quoting *William H. Raley Co. v. Superior Court* (1983) 149 Cal.App.3d 1042, 1049–1050, fn. 3 [197 Cal.Rptr. 232].) However, the court concluded that it most closely resembled a successive representation case, which implicated the "substantial relationship" test. Under that test, the court considers " ' "the similarities between the two factual situations, the legal questions posed, and the nature and extent of the attorney's involvement with the cases." ' " (*Morrison*, at p. 234, quoting *H. F. Ahmanson & Co. v. Salomon Brothers, Inc., supra,* 229 Cal.App.3d at p. 1455.) Further, "[i]t must be shown that the information from the prior representation is 'material' to the current employment." (*Morrison, supra,* 69 Cal.App.4th at p. 234, citing Rules Prof. Conduct, rule 3-310(E).[4]) Viewing the record in the light most favorable to the order, the *Morrison* court found a substantial relationship was inferable in all three categories. (*Morrison*, at pp. 234–236.)

---

[4] Further references to rules are to the Rules of Professional Conduct of the State Bar of California unless otherwise indicated.

As a final step in the analysis, because Centennial was never a client of Morrison Knudsen's, the court applied the "unity of interests" test, which asked whether Morrison Knudsen and its subsidiary Centennial should be treated as a single entity for purposes of analyzing the alleged conflict. (See *Morrison, supra,* 69 Cal.App.4th at p. 238.) After an exhaustive discussion, the court concluded that "[t]he attorney-parent relationship was sufficiently unusual, the substantial relationship test sufficiently close, and the unity of interests test sufficiently unsettled," that the trial court could reasonably conclude the Hancock firm had a conflict of interest sufficient to disqualify it from the case. (*Id.* at p. 253.)

The facts here are less complex than those in *Morrison,* but the analytical framework is the same. There is a substantial relationship between the Eldridge firm's prior representation of Kayla's father and Richard's current representation of Tyler. In both cases, Kayla plays a key role, formerly as a child of one of the litigants battling over custody, presently as the mother of the child who is litigating custody against the father, who also happens to be Richard's son. Kayla's maturity and emotional stability are subjects of dispute in the present case, and information obtained from her father in his family law matter could bear on that question as well. In both cases, the nature and quality of Kayla's home environment occupies an important role.

The trial court could reasonably find there was a significant danger that—as a result of its prior involvement in her father's divorce case—the Eldridge firm acquired relevant confidential information about Kayla to which it otherwise would not have had access. Both Kayla's father and her stepmother Megan met with the Eldridge firm in connection with Kayla's father's case. It is virtually inconceivable that family matters pertaining to Kayla were not discussed during these meetings. In addition, one of Tyler's declarations recites that Kayla was living with her father and stepmother at the time of Calvin's birth. He avers that after the birth, "Kayla's father and stepmother started pressuring Kayla to pursue a Master's Degree but she was denied entry after she applied. *Kayla then went to work for her father in his business* . . . . Kayla left this job before Calvin was born." Tyler goes on to state that "there were *conflicts within Kayla's father's home and Kayla had become fed up* and wanted to move out." (Italics added.) As Judge Mize pointed out, it is impossible to know whether some or all of these facts were gleaned not from Tyler, but from the Eldridge firm's representation of Kayla's father in the prior proceeding. While Richard maintained that his firm had been "out of [Kayla's father's] case" before Kayla and Tyler started dating, he was "not 100 percent" certain about the dates. And, as previously noted, no sworn testimony was taken at the hearing on the motion to disqualify.

Finally, Kayla's declaration stated that the Eldridge firm did acquire access to her confidential information and by virtue of the substantial evidence rule, we must accept that averment as true against any denials by Richard or his firm.

We also note that if we follow the successive representation model (see *Morrison, supra,* 69 Cal.App.4th at pp. 233–234), Kayla need not even show that Richard *actually* received confidential information. Under rule 3-310(E), " ' "When a substantial relationship has been shown to exist between the former representation and the current representation, and when it appears by virtue of the nature of the former representation or the relationship of the attorney to his former client confidential information material to the current dispute would normally have been imparted to the attorney or to subordinates for whose legal work he was responsible, the attorney's knowledge of confidential information *is presumed*." ' " (*Adams, supra,* 86 Cal.App.4th at p. 1331, italics added.)

Because of the close relationship between Kayla and her father, the similarity between the two cases and the overlapping factual issues common to both, we also conclude that Kayla and her father should be treated as a single unity for purposes of determining whether an ethical conflict exists.

For all of these reasons, we uphold the trial court's implied finding that Richard's firm obtained, or must be presumed to have obtained, confidential information in the prior case that could be used to gain an unfair advantage over Kayla in the present litigation.

## V. The Advocate-witness Rule

Another reason for supporting affirmance of the order below is the conflict posed by the almost inevitable prospect that Richard will act both as a percipient witness and an advocate in a dispute over Calvin's care and custody.

■ The "advocate-witness rule," which prohibits an attorney from acting both as an advocate and a witness in the same proceeding, has long been a tenet of ethics in the American legal system, and traces its roots back to Roman Law. (Luna, *Avoiding a "Carnival Atmosphere": Trial Court Discretion and the Advocate-witness Rule* (1997) 18 Whittier L.Rev. 447, 452-453 (hereafter Luna).) Luna quotes a 1980 version of rule 3.7 of the Model Rules

of Professional Conduct of the American Bar Association (ABA Model Rules). As amended in 2007, rule 3.7 now provides, in relevant part:[5]

"(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:

"(1) the testimony relates to an uncontested issue;

"(2) the testimony relates to the nature and value of legal services rendered in the case; or

"(3) disqualification of the lawyer would work substantial hardship on the client."[6]

As explained in *People v. Donaldson* (2001) 93 Cal.App.4th 916, 927–928 [113 Cal.Rptr.2d 548] (*Donaldson*), " 'Occasionally a lawyer is called upon to decide in a particular case whether he will be a witness or an advocate. If a lawyer is both counsel and witness, he becomes more easily impeachable for interest and thus may be a less effective witness. Conversely, the opposing counsel may be handicapped in challenging the credibility of the lawyer when the lawyer also appears as an advocate in the case. An advocate who becomes a witness is in the unseemly and ineffective position of arguing his own credibility. The roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively.' " (*Id.* at pp. 927–928, quoting former ABA Model Code of Prof. Responsibility, rule EC 5-9.)

This danger looms large in the present case. Richard is the head of a household that is the subject of controversy and conflicting averments. Thus, it is a virtual certainty that his testimony as a witness in this custody/visitation dispute will be necessary. As a witness, it is Richard's responsibility to tell the truth. As an advocate, it is his job to obtain the best result for his client. These duties may not necessarily be coextensive and where they are not, Richard may not be permitted to choose between them. The likelihood of conflict inherent in Richard's dual status is indisputable.

Indeed, problems in this regard had surfaced already *before* the court rendered its disqualification order. As Judge Mize noted, "[I]n the past

---

[5] The 2007 amendments to rule 3.7 of the ABA Model Rules did not change the rule's substance.

[6] The first two exceptions obviously do not apply here, and Tyler fails to cite any evidence in the record that he will suffer "substantial hardship" from having to retain unconflicted counsel. Further, as one commentator has noted, the substantial hardship exception is the " 'most difficult to apply,' causing 'confusion, inefficiency, and seemingly less-than-perfect results,' " and therefore courts have been loath to use it. (Luna, *supra,* 18 Whittier L.Rev. at p. 463, fn. omitted.)

hearing, [A]ttorney Richard Eldridge stated to the court that he (Richard) does not smoke pot and that he 'hates' cigarette smoke so much that he asks anyone smoking to leave the house and go into the back yard. At that point, is [A]ttorney Eldridge arguing as an attorney, testifying as a witness, making an offer of proof for his client, or maybe for himself as a witness? The confusion and 'untenable' nature of the conflict is not just prospective or likely: it already has been manifested in this case in a preliminary law and motion matter well before the much more problematic prospect of confusion and conflict likely in a full blown custody trial."

■ We acknowledge, as Tyler points out, that California's version of the advocate-witness prohibition (rule 5-210) is limited to jury trials.[7] However, rule 1-100 states that the prohibitions therein are "not exclusive," and it expressly permits consideration of ethical rules of other jurisdictions and bar associations. (Rule 1-100(A); see *Donaldson, supra*, 93 Cal.App.4th at p. 928.) Thus, "[e]specially where there is no conflict with the public policy of California, the [ABA] Model Rules serve as a collateral source for guidance on proper professional conduct in California." (*Donaldson*, at p. 928.)

Most of the difficulties inherent in an attorney's taking on the role of both advocate and witness are present regardless of whether the attorney's testimony will be given in front of a jury or a judge. "[T]he disorder to the judicial system does not result solely from the confusion caused by one person serving in multiple capacities at trial. Rather, the roles of advocate and witness are entirely irreconcilable and should not be undertaken by a single individual. . . . [T]he advocate-witness dilemma 'puts counsel in the position of both advocate and witness, one of which requires the lawyer to be partisan and the other of which requires him to be factual. It thus robs the trial of that appearance of fairness which should characterize every court hearing.' " (Luna, *supra*, at p. 481, fns. omitted, quoting *Rushton v. First National Bank* (1968) 244 Ark. 503 [426 S.W.2d 378, 385].)

Moreover, we perceive no California-based policy reason not to apply rule 3.7 of the ABA Model Rules to this case. Decades ago, the California Supreme Court firmly embraced the ethical prohibition against an attorney taking on the dual roles of advocate and witness: "An attorney who attempts to be both advocate and witness impairs his credibility as witness and diminishes his effectiveness as advocate." (*Comden v. Superior Court* (1978)

---

[7] Rule 5-210 provides, in pertinent part: "A member shall not act as an advocate *before a jury* which will hear testimony from the member unless: [¶] (A) The testimony relates to an uncontested matter; or [¶] (B) The testimony relates to the nature and value of legal services rendered in the case; or [¶] (C) The member has the informed, written consent of the client. . . ." (Italics added.)

20 Cal.3d 906, 912 [145 Cal.Rptr. 9, 576 P.2d 971].) More recently, our Supreme Court declared that where it becomes likely that an attorney will testify as a material witness, he should " 'resolve any doubt in favor of preserving the integrity of his testimony and against his continued participation as trial counsel.' " (*People v. Dunkle* (2005) 36 Cal.4th 861, 915 [32 Cal.Rptr.3d 23, 116 P.3d 494], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421 [87 Cal.Rptr.3d 209, 198 P.3d 11].)

The wisdom of the advocate-witness prohibition is vividly exemplified in this family law dispute, where it is probable that Richard may not only provide important testimony affecting the outcome, but actually represent his son in an adversarial role against the mother of his grandson. Under no judicially tolerable circumstance can Richard effectively perform such multiple, awkward and conflicting duties.

## VI. Other Concerns

As a final reason for our affirmance of the trial court's order, we find the multiple and interconnected family entanglements present here result in a strong appearance of impropriety and undermine the integrity of the judicial system.

As noted, Richard wears several different hats in this controversy. He is counsel for his son and is litigating against the son's former girlfriend; his law firm once represented the adverse party's father in a family law matter, acquired and utilized a declaration from the adverse party in that matter, and employed the adverse party's stepmother; he is the grandfather of the child whose best interests are at the center of this controversy; the nature and quality of his household (in which the son still resides) is the subject of an ongoing dispute that will directly affect the court's decisions on shared parenting arrangements; and he is a likely percipient witness in any trial regarding custody. As the trial judge observed, "The relationships are ongoing and the subject of the litigation cannot be left at the office."

Although it was a criminal case, we find *Peoples*, *supra*, 51 Cal.App.4th 1592 instructive. There, defense counsel Strawder was the defendant's sister. She was also the ex-wife of the victim, the mother of three of the percipient witnesses, and the sister of one of the defense witnesses. "The children lived with Strawder after the attack, and she transported them to court proceedings. Strawder attempted to discuss the assault with the victim and rehearsed her daughter so the latter would be ready to testify in court. There was, in fact, a significant possibility Strawder herself would be called as a witness at trial." (51 Cal.App.4th at p. 1598.)

The *Peoples* court held that the trial court properly recused Strawder on its own motion. The court found that although a defendant may waive a conflict to his own detriment, "[h]ere the court was also concerned for the children of the lawyer and the victim and the appearance of justice itself. Defendant could not waive those considerations." (*Peoples, supra,* 51 Cal.App.4th at p. 1599.) The appellate court rhetorically asked, "Could she [Strawder] effectively cross-examine her own children and ex-husband for the benefit of her brother, the minors' uncle?" (*Id.* at p. 1598.) It concluded, "As the trial court correctly recognized . . . , and to reiterate, Strawder's representation posed a significant threat not only to her responsibilities to her children (both as a lawyer and mother), her brother/client, her ex-husband/victim, but, perhaps, most of all to the integrity of the judicial process." (*Id.* at p. 1599.)

■ While we recognize that criminal cases enjoy special stature so as to ensure that defendants receive a fair trial, it is also true that family law matters deserve particular attention when it comes to maintaining high standards in ethics. Family law cases delve into the most intimate and personal of human affairs and therefore should receive careful scrutiny when potential ethical conflicts arise. " 'Matters of domestic relations are of the utmost importance to the parties involved and also to the people of the State of California.' " (*Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1357–1358 [63 Cal.Rptr.3d 483, 163 P.3d 160], quoting *Shippey v. Shippey* (1943) 58 Cal.App.2d 174, 177 [136 P.2d 86].) "This is especially so where the custody of a minor child is involved. Such children are the future citizens of this state and it is impossible to exercise too much care in the selection of the persons who are to care for and guide them during their period of infancy. It is likewise extremely important that they be provided with the best surroundings of which the circumstances permit." (*Shippey,* at p. 177.)

A family court's function is to make delicate decisions that promote the child's best interest. (See Fam. Code, § 3020.) This process could be severely disrupted in a situation where the child's grandfather might well argue for reducing the mother's time with her child, where counsel could wind up both litigating and testifying about what goes on in his household, and where Richard's self-interest could skew the legal advice he gives to his own son.

And what about little Calvin? Can the court countenance allowing the infant's grandfather to assume an adversarial role against the infant's mother in a dispute over the child's safety and welfare? Richard's continued representation of Tyler places Richard in a position where his family loyalties are in conflict, his responsibilities to his grandson are compromised, and the court would face the prospect of playing host to an awkward spectacle, where the lines between attorneys, relatives and litigants become blurred and confused.

■ Given the multiple family entanglements, the complex interrelationships between the parties, and the ethical conflicts posed by Richard's assumption of dual roles, we conclude the trial court did not abuse its discretion. (Code Civ. Proc., § 128, subd. (a)(5).)

## DISPOSITION

The order is affirmed. No costs are awarded. (Cal. Rules of Court, rule 8.278(a)(5).)

Duarte, J., concurred.

**NICHOLSON, Acting P. J.,** Concurring.—I concur fully as to parts I. through V. and concur in the result as to part VI.