Filed 3/21/24  In re L.W. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re L.W., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, | G063113 |
| Plaintiff and Respondent, | (Super. Ct. No. 23DP0304) |
| v. | O P I N I O N |
| A.J., | |
| Defendant and Respondent, | |
| L.W., | |
| Minor and Appellant. | |

Appeal from an order of the Superior Court of Orange County, Lindsey E. Martinez, Judge.  Affirmed.

Joanne D. Willis Newton, under appointment by the Court of Appeal, for Minor and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Deborah B. Morse, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Defendant and Respondent.

\*          \*          \*

L.W., a minor, appeals from the juvenile court's disposition order, which declared L.W. a dependent of the juvenile court but did not remove her from her mother's custody. Instead, the juvenile court ordered custody to remain vested with both her mother and father with family maintenance services. According to L.W., this was an error because there was clear and convincing evidence of substantial danger if she remained in her mother's custody and no reasonable means to protect her health, and thus, she should have been removed from her mother's custody pursuant to Welfare and Institutions Code section 361, subdivision (c)(1).[1] The Orange County Social Services Agency (SSA) agrees with L.W.'s position on this appeal. The evidence, however, does not compel a finding in favor of appellant as a matter of law, which is the narrow standard of review applicable here. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 17, 2023, L.W. (then 10 years old) arrived home after school but was not able to enter the house, where she lived with her older brother G.W.[2] (then 16 years old) and her mother A.J. (Mother). G.W. arrived later and also was not able to enter the house as he did not have his key. After waiting in the backyard for some time, they called 911.

Mother was in the hospital at the time, and the police were able to bring the key to L.W. and G.W. so that they could enter the house. Mother went out drinking on

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] G.W. has the same initials as his and L.W.'s presumed father. This opinion uses G.W. to refer to the child and Father to refer to the presumed father. Unlike L.W., G.W. did not appeal and is only discussed to the extent relevant to this appeal. Similarly, Father is not a party to this appeal and is only discussed to the extent relevant to this appeal.

2

St. Patrick's Day and, after reportedly being found passed out in her front yard around 1:30 p.m., she was transported to the hospital. Mother believed her drink at a bar had been spiked with an unknown substance.

SSA sought and was granted a protective custody warrant, resulting in L.W. and G.W being removed from the home. SSA then filed a juvenile dependency petition pursuant to section 300, subdivision (b)(1). The petition alleged, among other things, that Mother had an unresolved substance abuse problem related to alcohol, which has resulted in her failing to consistently and adequately supervise L.W. and G.W. It also alleged Mother and Father had a history of domestic violence, Father had certain criminal convictions related to domestic violence incidents, and there was an active restraining order protecting Mother from Father.

In its March 22, 2023 detention report, SSA recommended L.W. and G.W. be detained with authorized release to a parent, relative, or suitable adult. Among other things, this report described an interview with Mother in which she noted she drank daily and had a problem with alcohol sometimes, but stated March 17 was a one-time thing because of St. Patrick's Day. The report also recounted discussions with G.W. and L.W., including that G.W. conveyed Mother drinks daily and to the point of blacking out two to three times a week (Mother denied blacking out in the past besides the March 17 incident), and L.W. noted Mother drank alcohol about three times a week in one discussion and about four times a week in another. G.W. stated he is disciplined by having his things taken and being yelled at, but it is only him (not L.W.) Mother yells at. L.W. denied Mother becomes violent when drinking but noted Mother does yell at the children. At the March 22, 2023 detention hearing, the juvenile court made a number of findings, including that "[c]ontinuance in the home is contrary to the child's welfare" and "there is a substantial danger to the physical health of the child and there are no reasonable means by which the child's physical or emotional health may be protected without removing the child from the parents' physical custody." The juvenile court

3

authorized SSA to release the children to a parent, relative, or suitable adult as deemed appropriate and noted both children had been placed with non-related extended family members. It also ordered visitation for Mother and Father.

In its April 13, 2023 jurisdiction/disposition report, SSA recommended the children continue to remain in out-of-home care and the juvenile court sustain the allegations in the petition, declare the children dependents, and also find there is a substantial danger to the children if they are returned home and there are no reasonable alternative means to protect them. Among other things, this report recounted new discussions with L.W., G.W., Mother, Father, and the maternal grandmother. G.W. reported Mother drinks nearly daily, would get drunk and really angry, and would yell at him almost every time, and had told him he was a terrible son. G.W. also noted he and L.W. had been locked out once or twice before when Mother had been passed out inside.[3] L.W. reported Mother drank alcohol about five times a week. Moreover, the report said law enforcement call logs from 2022 showed one call in which it was believed Mother was under the influence, and one call in which Mother claimed to have a restraining order against G.W. but later said she had been drinking. The report also noted Mother had convictions related to two driving under the influence (DUI) incidents in 2022 and 2005. However, Mother reported she had remained alcohol free since the children were detained, had begun attending Alcoholics Anonymous (AA) and School Ten to address her drinking, and was willing to wear a Secure Continuous Remote Alcohol Monitoring (SCRAM[4]) device.

The jurisdiction/disposition report also discussed that Mother had said domestic violence between Father and her began in 2016 and, while she had contacted

---

[3] The detention report conveyed L.W. had stated there had been one previous time where Mother had not answered the door because she had been drinking, but it was not for very long.

[4] A SCRAM device "monitors alcohol consumption transdermally and immediately sends a report to the court should defendant consume any alcohol." (*People v. International Fidelity Ins. Co.* (2017) 11 Cal.App.5th 456, 459.)

4

law enforcement on two occasions, there were many other times she should have called law enforcement. Father noted Mother had assaulted him on many occasions while she was under the influence but he had never called the police. Father stated he and Mother had no contact for the past three and a half years and he had not been able to have a relationship with the children because of the restraining order. G.W. noted his parents would yell at each other and it was usually Mother who instigated fights. He recalled one occasion when he saw Father hit Mother, and he believed Father hit Mother on more than one occasion because he could hear them arguing. L.W. also recalled seeing Father hit Mother once but had never seen Mother hit Father. The maternal grandmother conveyed she had not had a consistent relationship with Mother for three and a half to four years, Mother becomes violent and aggressive when she drinks, and Father was not the aggressor.

On April 13, 2023, the juvenile court held a jurisdictional hearing. Mother and Father submitted to the petition (as amended by interlineation), and the juvenile court found the allegations to be true by a preponderance of the evidence such that it brought the children within the provision of section 300, subdivision (b)(1). The juvenile court ordered a disposition hearing for a future date.

SSA next issued its June 8, 2023 addendum report #1. Among other things, this addendum noted Mother had reported she is attending AA meetings and participating in DUI classes, but she did not want to provide additional contact information for her services to verify participation because she did not want them to know about the dependency case. Mother further expressed she is being monitored by her SCRAM device, which should be sufficient, and there is no need for her to participate in additional services. SSA recommended the children be declared dependents of the juvenile court and returned to the custody of Father. While SSA noted Mother had remained sober with no tamper events or alcohol consumption events on the SCRAM device (which had been applied April 10), SSA said it was concerned with Mother's lack of insight for long-term

5

safety because she thought she was already doing enough and did not need additional support or services. On June 8, 2023, the juvenile court ordered G.W. released to Father under a trial release and continued the disposition hearing.

SSA then issued its July 27, 2023 addendum report #2. Among other things, this addendum stated SSA had spoken with a program director for School Ten regarding Mother's services. SSA was informed Mother had enrolled in the program in May 2023 with a projected completion in February 2024; the program alternated weekly between a 2-hour group session and a 15-minute "face to face" (and she also needed to complete one self-help meeting per week); and Mother was in compliance with all requirements. Additionally, the addendum recounted a discussion with L.W. in which she expressed visits with Mother were going okay, she was not ready to begin unsupervised visits with Mother, and Mother had made comments that make her uncomfortable (such as "you need to choose me" and "you need to come home"). When asked if she felt safe in Mother's care, L.W. replied "sometimes." In a subsequent discussion about a month later, L.W. said she was ready to have unsupervised time with Mother. When asked who she saw herself living with in the future, L.W. answered she did not know; she would feel safe residing with Mother. L.W. also stated Mother gets mad a lot but currently becomes upset less than before. At the July 27, 2023 hearing, the juvenile court continued the disposition hearing.

SSA then issued its August 2, 2023 addendum report #3. As discussed in that addendum, among other things, the maternal grandmother conveyed G.W. had a breakdown after leaving Mother's house, where they had gone to pick up some of his belongings. According to the maternal grandmother, G.W. shared with her he had not been honest with the social workers, Mother had hit him in the past, and when he had attempted to speak with Mother about hitting him, Mother said he was lying. At the August 2, 2023 hearing, the juvenile court continued the disposition hearing. Mother also requested to switch testing methods and remove the SCRAM device as it was causing her

6

pain, and the juvenile court authorized SSA to use its discretion regarding the SCRAM device.

SSA then issued its August 28, 2023 addendum report #4. Among other things, this addendum recounted G.W.'s description of what had happened when he went to pick up his belongings. He said entering the home brought back various memories, including recalling Mother drinking and screaming in the garage, and when he would check on her there, she would yell and say things such as "you're worthless just like your dad." G.W. also added Mother would hit him, and on one occasion, Mother entered his bedroom, yelled and told him to get out, and started punching and pushing him. During that incident, G.W. said Mother called the police, who came to their home, and told them he was being terrible, but the police dismissed her statements. G.W. further shared Mother would become physically aggressive once or twice a week (when she had too much to drink). He noted she usually hit him on the back or shoulder because he would turn his back and she rarely slapped his face. G.W. stated Mother's aggressive behavior started earlier in the year and the last time she became aggressive with him was the week he was removed. However, G.W. said he was almost certain Mother had not been physically aggressive with L.W.

This addendum also described a discussion with L.W. When asked how she was disciplined, L.W. noted Mother would take things away from her but denied there was any corporal punishment. L.W. stated Mother was more aggressive with G.W. and would "cuss him out," but she was unsure whether any pushing occurred and had not seen anything. L.W. noted her visits with Mother and Father were okay. L.W. stated during one visit, when she asked Mother about the end of the visit, Mother became upset and asked her if she wanted Mother to leave.

At the disposition hearing on August 28, 2023, only Mother testified. She said she had never physically abused her children and G.W. was lying about physical abuse. Mother denied telling G.W. he was worthless but testified she had said "you're

7

being an asshole, like your dad." Mother testified she wore the SCRAM device for 120 days. Mother further testified she has maintained her sobriety since the SCRAM device was removed, she has been doing School Ten and attending three AA meetings a week via Zoom, and sobriety is her long-term plan. Mother testified she will keep going to AA meetings, but she had not started the steps and did not have a sponsor. Mother also testified if L.W. was returned to her care, it would not stretch her ability to maintain sobriety and, instead would help her maintain it. Mother agreed her alcohol abuse had an impact on G.W. but testified she did not know how it has affected L.W. Mother also testified she would not discuss Father with L.W. or make any disparaging comments about him while L.W. was under the same roof as her.

During closing arguments the next day, SSA's counsel argued it had no safety concerns about L.W. being in Father's care and recommended L.W. be placed with Father with family maintenance services. SSA's counsel argued it was premature to return L.W. to Mother's care and SSA had met its burden regarding opposing the return of L.W. to Mother. L.W.'s counsel and Father's counsel similarly argued L.W. should be in Father's care with family maintenance services and not be returned to Mother. Conversely, Mother's counsel asked the juvenile court to order family maintenance services for Mother and to work out a visitation schedule.

After hearing closing arguments, the juvenile court issued its rulings. For G.W., it declared him a dependent of the court; ordered custody vested with Father; and found by clear and convincing evidence that section 361, subdivision (c)(1), applies regarding Mother.[5] However, the juvenile court noted G.W. was differently situated from L.W. While it also declared L.W. to be a dependent of the court, it ordered custody to remain vested with both Mother and Father with family maintenance services. The juvenile court noted Mother presented as upset and angry and had admitted to violating

---

[5] In closing arguments, Mother's counsel said she would submit on primary physical custody of G.W. to Father.

8

some court orders. However, it recognized she wore a SCRAM device for 120 days and found there was "no evidence whatsoever that she is currently using alcohol or let alone abusing it." The juvenile court continued "[m]uch has been made that she's not working the steps or that she doesn't have a sponsor, but she's pretty candid and says that she does do the three classes a week." It also stated, while Mother had not yet completed her case plan, that was not necessarily required by that date. The juvenile court further noted L.W. had never said she was afraid or did not want to return home to Mother, and while there were some "I don't knows" and "I'm not sures," the juvenile court noted L.W. did not testify, and any attempt to explain further what those responses mean is speculation. Thus, the juvenile court found any risk of harm to L.W. in Mother's care to be speculative. It further found SSA had failed to meet its burden by clear and convincing evidence under section 361, subdivision (c)(1), and failed to articulate a specific risk of physical or emotional harm if L.W. were left in Mother's care.

L.W. timely appealed.

## DISCUSSION

Under section 361, subdivision (c)(1), "[a] dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence" that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) "'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' [Citation.]" (*In re M.D.* (2023) 93 Cal.App.5th 836, 856-857.) "'In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current

9

circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention.' [Citation.]" (*Id.* at p. 856.)  Here, L.W. argues the juvenile court erred by not applying section 361, subdivision (c)(1), to remove her from Mother's custody and that sole physical custody should have been given to Father with family maintenance services.  SSA agrees with L.W.'s position,[6] but we cannot find error in the trial judge's assessment.

As an initial matter, L.W. correctly recognizes the standard of review here is not the typical substantial evidence review that would apply if the juvenile court had granted – not denied – removal.  Instead, where, as here, "the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)  "Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' [Citation.]" (*Ibid*; see also *In re Luis H.* (2017) 14 Cal.App.5th 1223, 1226-1227.)  In short, we look to whether the "undisputed facts lead to only one conclusion." (*In re I.W., supra,* 180 Cal.App.4th at p. 1529.)

L.W. and SSA attempt to raise a number of evidentiary points to argue the evidence compels finding as a matter of law there would be a substantial danger to L.W. if she were returned to Mother's physical custody.  For example, they assert Mother has a history of alcohol abuse and aggressive behavior while intoxicated.  They further argue Mother has minimized her alcohol abuse, failed to engage in sufficient steps to address her behavior (*e.g.*, working a 12-step program), and demonstrated a lack of accountability

---

[6]     While Mother did not file a brief, "we do not treat the failure to file a respondent's brief as a 'default' (i.e., an admission of error) but independently examine the record and reverse only if prejudicial error is found." (*Kennedy v. Eldridge* (2011) 201 Cal.App.4th 1197, 1203.)

10

for her actions and understanding of their impact.  But this is not uncontradicted and unimpeached evidence that left no room for the juvenile court to find it insufficient.  For example, as the juvenile court found, Mother wore a SCRAM device for 120 days and there was "no evidence whatsoever that she is currently using alcohol let alone abusing it."  Moreover, while the juvenile court recognized Mother was not doing the steps and did not have a sponsor, it stated she was "pretty candid and says that she does do the three classes a week."

Thus, L.W. and SSA failed to show reversal is required.  "Here, as in many dependency cases, the case posed evidentiary conflicts.  And, as is common in many dependency cases, this case obligated the juvenile court to make highly subjective evaluations about competing, not necessarily conflicting, evidence."  (*In re I.W., supra,* 180 Cal.App.4th at p. 1528.)  But "[i]t is not our function to retry the case."  (*Ibid.*)  L.W. and SSA attempt to discount the impact of Mother's sobriety while on the SCRAM device.  L.W. asserts "[t]he fact that [Mother] apparently remained alcohol-free for 120 days did not ensure she would not return to drinking after the minor was returned to her care, nor did it prove that she had remained free of other substance abuse during the 120-day period."  Similarly, SSA argues "[a]bstaining from alcohol abuse while being monitored on SCRAM is commendable, but not reasonable evidence of reform on these facts."  These arguments, however, are misplaced.  L.W. and SSA essentially ask us to re-weigh conflicting and competing evidence – *e.g.*, Mother's sobriety for 120 days while using the SCRAM device compared to her history of alcohol abuse and behavior – to reach a different conclusion than the juvenile court, which we cannot do.  Simply put, this is "not a case where undisputed facts lead to only one conclusion."  (*Id.* at p. 1529.)[7]

---

[7] SSA also points to the juvenile court's finding that G.W. was subject to removal.  However, just because the juvenile court removed G.W. does not mean it erred by reaching a different result for L.W.  "[W]here more than one child is the subject of a dependency proceeding, the juvenile court must analyze each child's circumstances independently at the dispositional stage."  (*In re Dakota J.* (2015) 242 Cal.App.4th 619, 632.)

11

## DISPOSITION

The disposition order is affirmed.


                                    BEDSWORTH, ACTING P. J.

WE CONCUR:


GOETHALS, J.


GOODING, J.