Filed 5/31/13  In re A.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.M., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>H.M. et al.,<br><br>Defendants and Respondents;<br><br>C.L.,<br><br>Objector and Appellant. | E056051<br><br>(Super.Ct.No. J240884)<br><br>**OPINION** |

APPEAL from the Superior Court of San Bernardino County.  Barbara A. Buchholz, Judge.  Affirmed.

Liana Serobian, under appointment by the Court of Appeal, for Objector and Appellant C.L.

1

Jean-Rene Basle, County Counsel, and Jeffrey L. Bryson, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for Defendants and Respondents H.M. and V.B.

C.L. (the father) is the biological father of A.M. (A. or the child). When the child was born, her mother was married to V.B. (the husband).[1] In this dependency proceeding, the juvenile court found that the husband — not the father — was the child's presumed father. It placed the child with the husband, and it denied the father's request for reunification services.

The father appeals, contending:

1. The juvenile court erred by refusing to find that the father was entitled to presumed father status.

---

[1]     When this case was originally filed, the child's name was listed as A.B. (i.e., using the husband's last name). At the detention hearing, the mother's counsel stated that the child's true name was actually A.M. (i.e., the mother's last name). The court replied, "The court will not change the [child's] last name until we have confirmation via a birth certificate."

Thereafter, her birth certificate was duly filed; it showed her name as A.M. Thus, at the jurisdictional/dispositional hearing, the juvenile court was asked to correct the child's name to A.M. It responded, "I agree."

Unfortunately, the resulting minute order stated, "Court makes a finding that the minor's true name is [*A.B.*] . . . ." (Italics added; capitalization omitted.)

"'[W]hether the recitals in the clerk's minutes should prevail as against contrary statements in the reporter's transcript, must depend upon the circumstances of each particular case.' [Citation.]" (*In re Kyle E.* (2010) 185 Cal.App.4th 1130, 1136.) Here, it is clear that the juvenile court intended to find that the child's true name is A.M.

2. The father's constitutional rights were violated because he was not given paternity testing or visitation for several months.

We find no error. Hence, we will affirm.

I

GENERAL BACKGROUND

In 1999, when H.M. (the mother) was 16, she and the husband had their first child together. In 2000, they got married. In 2007, after their sixth child was born, they separated. The husband was awarded custody of the six children; the mother had visitation.

In January 2009, the mother gave birth to a seventh child, A. According to A.'s birth certificate, she took the mother's last name; the birth certificate did not list any father.

In June 2009, the mother obtained a restraining order against the husband prohibiting him from threatening her or making false police reports against her.

In September 2011, the husband called the police; he reported that the mother had stolen his truck. When the police determined that he had actually given her permission to use the truck, they arrested him for perjury and for violation of the restraining order.

The police found all seven children in the husband's home. They also found filthy conditions in the home, including old food lying around and backed-up toilets. The husband explained that his mother had recently died, and he was suffering from depression. San Bernardino County Children and Family Services (the Department) was

3

not immediately able to locate the mother or any other relatives who could take care of the children. Accordingly, it detained all seven children and filed a dependency petition as to them.

The mother and the husband both appeared at the detention hearing. The husband asserted that he was the father of all seven children. The mother, however, identified A.'s father as one S.M.

Sometime in September or October 2011, the father contacted the social worker and claimed to be the child's father.

At a hearing in October 2011, the father requested visitation. The husband had had a paternity test, but the results had not yet been received. The juvenile court ordered that, if the husband turned out not to be the biological father, the father would be tested. Then, if the father turned out to be the biological father, it would allow him visitation.

In January 2012, the Department filed the paternity test results. They revealed that the husband was not the child's biological father and that the father was. The father was immediately allowed visitation.

Meanwhile, the mother did not participate in services and visited the children only sporadically. The six older children were placed with the husband.

In April 2012, at the jurisdictional/dispositional hearing, the juvenile court found that it had jurisdiction based on failure to protect. (Welf. & Inst. Code, § 300, subd. (b).) It formally removed the child from the mother's custody and placed her with the husband.

4

It found that the husband was the child's presumed father and that the father was not; thus, it ordered reunification services for the husband but not for the father.

## II

## FACTUAL BACKGROUND

The following facts are taken from the evidence that was before the juvenile court at the dispositional hearing.

The husband had an "extensive" criminal history, including three convictions for aggravated assault, as well as convictions for statutory rape,[2] carrying a concealed firearm without a license, possession of a controlled substance for sale, being under the influence of a controlled substance, receiving stolen property, theft by invalid access card, conspiracy, contempt of court, and unauthorized entry of a dwelling. He admitted a past history of using methamphetamine. During the dependency, he had tested positive for methamphetamine once.

The father had been in the military from 2006 through 2008, receiving an honorable discharge. He had no known criminal history. He denied ever using any illegal substances. By the time of trial, he was a full-time college student, majoring in criminal justice.

When the child was conceived, the mother was not living with the husband. After she got pregnant, however, she moved back in with him. Thus, she was living with him

---

[2]     This conviction arose out of his sexual intercourse with the mother when she was 16, which resulted in the birth of their first child.

5

when the child was born. He was at the hospital for the birth. The mother did not list him (or anyone else) on the birth certificate, because she was not sure who the child's father was.

The mother continued to live with the husband until the child was about six months old. During this time, he provided for the child and helped to feed and care for her. Even after the mother moved out, however, she and the child would visit the husband and the older children. Sometimes, she left the child with the husband overnight or for a weekend. The child "considered [the husband] her father."

Meanwhile, the father had moved to Illinois. The mother did not immediately notify him of the birth because she did not believe he was the father. She did not have his phone number, but she was able to contact him through Facebook and Skype.

At some point,[3] via Facebook, she told him that she had had a child and that he was one of several possible fathers. He asked her to send him photos of the child. When he saw them, he felt that the child looked "exactly" like him when he was a child.

The father could not leave Illinois because he was taking care of his own father, who had cancer. He told the mother that he would to pay the airfare for her and the child to visit him in Illinois, but he was never able to come up with enough money. They agreed that he should get a paternity test, but again, he did not have enough money. The

---

[3]     The father gave the date as mid-2009, which would be when the child was about six months old. The mother gave the date as when the child was a year to a year and a half old, which would be early to mid-2010.

6

mother told him that he could get a free paternity test through the child support authorities. However, he did not.

In March 2011, the father returned to California "to be closer to A[.]" Two or three days later, the mother brought the child for a visit.[4] After that, however, according to the father, she stopped answering or returning his phone calls.

In May 2011, the mother called and asked if he wanted another visit. They agreed that the child would visit for the weekend. However, the mother did not come back as planned and did not return his phone calls, so the father ended up keeping the child for two weeks. During this time, he bought her clothes and diapers.

The mother and the child also may have visited a third time. Finally, the father stayed overnight with the mother and child.

Thereafter, according to the father, the mother stopped answering or returning phone calls again. One day, he called her then-boyfriend, Ed, who told him that the child was in foster care.

The mother denied preventing the father from having access to the child. She explained that her cell phone had been "shut off" for "a month or two." However, she testified, the father had Ed's phone number and could have contacted her that way. He could also have contacted her via Facebook.

---

[4] The father's trial testimony on this point conflicted with his statement to a social worker that he was not able to arrange a visit until the two-week visit in May 2011.

The father never paid any child support. According to him, he offered to pay, but the mother declined. According to the mother, however, he never offered. He had never given the child a birthday or Christmas present.

As a result of the dependency, the father had started having visitation with the child. At first, she was "really hesitant," but "then she slowly started to warm up to [him]." She called him "daddy."

The husband was also visiting the child. The child also called him "daddy."

On the day of the hearing, the mother and the father signed a voluntary declaration of paternity. (Fam. Code, § 7570 et seq.)

III

PROCEDURAL BACKGROUND

In connection with the dispositional hearing, the Department recommended that the child remain in foster care, that the father receive reunification services, and that the husband be denied reunification services. The husband contested the recommendation.

At the hearing, counsel for the Department conceded that the husband qualified as a presumed father because he was married to the mother when the child was born (Fam. Code, § 7611, subd. (a)) but argued that the father was entitled to be treated as a presumed father under *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*).

The father's counsel argued that his client had "acted like the father" and had done all he could, under the circumstances. He "ask[ed] the Court at a minimum to give [the father] services."

8

Counsel for the child disagreed with the Department's recommendation. She argued that the father was not a *Kelsey S.* father and that "it would be in [the child's] best interest to maintain a relationship with [the husband] . . . ."

The husband's counsel argued that the husband qualified as a presumed father not only because he was married to the mother when the child was born but also because he had received the child into his home and held her out as his own (Fam. Code, § 7611, subd. (d)), and that the father did not qualify as a *Kelsey S.* father. She also argued that it was in the child's best interest to be with the husband.

Counsel for the mother joined in the arguments of counsel for the husband and counsel for the child.

The juvenile court began by noting that the husband was not entitled to a conclusive presumption of paternity under Family Code section 7540 because he was not cohabitating with the mother when the child was conceived. However, it found that the husband did qualify as a presumed father because he was married to the mother when the child was born. (Fam. Code, § 7611, subd. (a).) It also found that the father had not rebutted that presumption by clear and convincing evidence. (See Fam. Code, § 7612, subd. (a).) Next, it found that the father did not qualify as either a presumed father or a *Kelsey S.* father. It concluded by "declar[ing] [the husband] the presumed father in this case."

9

IV

MOOTNESS

The Department contends that this appeal is moot. In support of that contention, it has asked us to take judicial notice that, while the appeal was pending, the juvenile court dismissed the dependency and issued an exit order giving the husband custody.

The juvenile court's order is judicially noticeable. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).) Moreover, we can consider postjudgment evidence for the purpose of determining whether an appeal is moot. (*In re A.S.* (2012) 205 Cal.App.4th 1332, 1339.) Accordingly, we grant the request for judicial notice.

We conclude, however, that the appeal is not moot. "As a general rule, an order terminating juvenile court jurisdiction renders an appeal from a previous order in the dependency proceedings moot. [Citation.]" (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1488.) However, "'[a]n issue is not moot if the purported error infects the outcome of subsequent proceedings.' [Citation.]" (*Ibid*.) Here, the order appealed from directly impacts the exit order giving the husband custody. (See *In re J.S.* (2011) 199 Cal.App.4th 1291, 1295.)

# V

## THE EFFECT OF THE DEPARTMENT'S CHANGE OF POSITION

The husband and the child have not filed briefs in this case.[5]  The Department, however, has filed a brief arguing in favor of affirmance.  The father therefore contends that the Department is barred from opposing his position on appeal because it supported his position below.

He relies on cases holding that a litigant cannot raise a new theory on appeal as a basis for *reversal*.  "Appellate courts are loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider.  [Citation.]" (*JRS Products, Inc. v. Matsushita Electric Corp. of America* (2004) 115 Cal.App.4th 168, 178.)

However, a litigant is not necessarily barred from raising a new theory on appeal as a basis for *affirmance*.  "'"'No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for the wrong reason.  If right upon any theory of law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its

---

[5]     The father asserts that the husband is not a "part[y] to this appeal."  The Department concurs.  However, that is not strictly accurate.  The husband was a party to the proceeding below, and he is directly interested in the outcome of the appeal; hence, he would be entitled to file a respondent's brief.  (See *Slaughter v. Edwards* (1970) 11 Cal.App.3d 285, 288-289.)  The appellant's opening brief was served on him, however, so evidently he has chosen not to appear.

conclusion.'''"  [Citation.]"  (*People v. Geier* (2007) 41 Cal.4th 555, 582.)  "'The rule that the appellate court is interested in the decision rather than the reasons of the lower court necessarily means that the doctrine of theory of trial will often be disregarded in order to *affirm*, not reverse, the judgment.'  [Citation.]"  (*Superior Motels, Inc. v. Rinn Motor Hotels, Inc.* (1987) 195 Cal.App.3d 1032, 1055, fn. 13.)

We recognize that "if the new theory contemplates a factual situation the consequences of which are open to controversy and were not put in issue or presented at the trial the opposing party should not be required to defend against it on appeal.  [Citations.]"  (*Panopulos v. Maderis* (1956) 47 Cal.2d 337, 341.)  Here, however, the Department is merely adopting the position that the husband, the mother, and the child took below.  Hence, the issues were fully and fairly litigated.

Even if the Department had wholly failed to file a respondent's brief, the father would not win by default; rather, we would "independently examine the record and reverse only if prejudicial error is found.  [Citations.]"  (*Kennedy v. Eldridge* (2011) 201 Cal.App.4th 1197, 1203.)  A fortiori, we are entitled to consider the Department's contentions in determining whether the father has carried his burden of demonstrating error.

VI

THE JUVENILE COURT'S PATERNITY DETERMINATION

A. *Presumed Fatherhood*.

The father contends that the juvenile court erred by refusing to accord him presumed father status.

"The Uniform Parentage Act, [Family Code] section 7600 et seq. (the Act), provides the framework by which California courts make paternity determinations. [Citation.]  Under section 7611 of the Act, a man is presumed the natural father of a child born during, or within 300 days after the termination of, his marriage to the child's mother.  ([Fam. Code,] § 7611, subd. (a).)  He also attains the status of presumed father if he receives the child into his home and openly holds out the child as his natural child. ([Fam. Code,] § 7611, subd. (d).)" (*Dawn D. v. Superior Court* (1998) 17 Cal.4th 932, 937.)

"An alleged father has the burden to establish, by a preponderance of the evidence, the foundational facts supporting his entitlement to presumed father status . . . . [Citation.]" (*In re M.C.* (2011) 195 Cal.App.4th 197, 212.)

"We review a juvenile court's determination of presumed parentage status under the substantial evidence standard.  [Citations.]  '[W]e review the facts most favorably to the judgment, drawing all reasonable inferences and resolving all conflicts in favor of the order.  [Citation.]  We do not reweigh the evidence but instead examine the whole record

to determine whether a reasonable trier of fact could have found for the respondent. [Citation.]' [Citation.]" (*In re M.C.*, *supra*, 195 Cal.App.4th at p. 213.)

The husband was married to the mother when the child was born. Thus, he is a presumed father under Family Code section 7611, subdivision (a).

The father's voluntary declaration of paternity was ineffective. "A voluntary declaration of paternity is invalid if, at the time the declaration was signed, . . . [¶] . . . [¶] [t]he child already had a presumed parent under subdivision (a) . . . of Section 7611." (Fam. Code, § 7612, subd. (e)(2).) Here, the husband was already the child's presumed father under Family Code section 7611, subdivision (a).

The father contends that he received the child into his home and openly held her out as his daughter, so as to qualify as a presumed father under Family Code section 7611, subdivision (d). We consider the two prongs of this subdivision separately.

The child never resided with the father. He therefore argues that regular and consistent visitation can constitute the necessary "reception." However, it is well established that visitation that is *not* regular and consistent does *not* qualify. (*In re Cheyenne B*. (2012) 203 Cal.App.4th 1361, 1379-1380.) Here, prior to the dependency, the father visited the child just three or four times; only two of those visits took place in his home. He testified that the longest visit was supposed to be just "for the weekend"; however, the mother did not come back as planned and did not return his phone calls, so he ended up keeping the child for two weeks. This is not evidence of receipt into his

home; to the contrary, it is evidence that he acknowledged the mother's custody and control of the child.

The father also never openly held out the child as his own. "In determining whether a man has 'receiv[ed a] child into his home and openly h[eld] out the child' as his own [citation], courts have looked to such factors as whether the man actively helped the mother in prenatal care; whether he paid pregnancy and birth expenses commensurate with his ability to do so; whether he promptly took legal action to obtain custody of the child; whether he sought to have his name placed on the birth certificate; whether and how long he cared for the child; whether there is unequivocal evidence that he had acknowledged the child; the number of people to whom he had acknowledged the child; whether he provided for the child after it no longer resided with him; whether, if the child needed public benefits, he had pursued completion of the requisite paperwork; and whether his care was merely incidental. [Citations.]" (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1211.)

Here, none of these factors weighed in the father's favor. At most, he provided incidental care for the child during visits. He claims that he acknowledged the child. The cited portions of the record, however, do not support this. In one, the mother testified that she may have sent photos of the child to the father via his mother. In another, she also testified that, when she left the child with the father for two weeks, the father was living

with his "mom and pops."[6]  It would be odd if the father had a toddler stay with him for two weeks without explaining to his "mom and pops" who she was; still, this is hardly "*unequivocal evidence* that he . . . acknowledged the child."  And even if it were, it would show that he acknowledged the child to two close family members, at most.  It fails to show that he "openly" held her out as his own.

Thus, the father is not a presumed father under any statutory definition.

B.      *"Kelsey S." Fatherhood*.

The father therefore also argues, alternatively, that he is entitled to be treated as a presumed father under *Kelsey S*.  *Kelsey S.* held that, as a matter of equal protection, when "an unwed father [has] promptly come[] forward and demonstrate[d] a full commitment to his parental responsibilities" (*Adoption of Kelsey S.*, *supra*, 1 Cal.4th at p. 849), but he has been prevented by the mother (or someone else) from receiving the child into his home and thus from becoming a presumed father, he must be accorded the same statutory rights as a presumed father.  (*Id*. at pp. 844-850.)

Although the specific statutory right involved in *Kelsey S.* was the right to refuse consent for an adoption, it has since been extended to include statutory rights in a dependency proceeding.  (*In re D.M.* (2012) 210 Cal.App.4th 541, 551.)

In evaluating a *Kelsey S.* claim, "the trial court must consider whether [the father] has done all that he could reasonably do *under the circumstances*."  (*Adoption of Kelsey*

---

**6**      As the father's own father had been living in Illinois and had cancer, presumably "pops" refers to a stepfather.

*S.*, *supra*, 1 Cal.4th at p. 850, fn. omitted.) "Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. . . . A court should also consider the father's public acknowledgement of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child." (*Id*. at p. 849, fn. omitted.)

"The burden is on the biological parent 'to establish the factual predicate' for *Kelsey S.* rights. [Citation.]" (*Adoption of Myah M.* (2011) 201 Cal.App.4th 1518, 1539.) "When deciding whether a parent meets the requirements under *Kelsey S.*, appellate courts have reviewed the ruling for substantial evidence. [Citations.] . . . To the extent that the issue is a mixed question of law and fact, we exercise our independent judgment in measuring the facts against the applicable legal standard. [Citation.]" (*Ibid*.)

Here, the father did not promptly demonstrate a full commitment to his parental responsibilities. Prior to the dependency, he did not try to establish paternity or to contribute to the child's support. Most significantly, he never sought custody. (See *In re Elijah V.* (2005) 127 Cal.App.4th 576, 583 [*Kelsey S.* father "must also demonstrate a willingness to assume full custody"].) While in Illinois, he only tried to arrange visitation (and he never did, due to lack of funds). Once in California, he continued to try to arrange visitation. He complains that the mother was "extremely difficult to reach . . . ." This is beside the point, however, as it appears that he never attempted to obtain custody, as opposed to visitation. Indeed, he admitted that, during the week that both the mother

and the child were staying with him, he did not discuss custody with her, "because I didn't want to discuss that in front of my family." That is the opposite of the full public commitment to parenthood that *Kelsey S.* requires.

C.      *Weighing Conflicting Presumptions*.

"Although more than one individual may fulfill the statutory criteria that give rise to a presumption of paternity, 'there can be only one presumed father.' [Citations.]" (*In re Jesusa V.* (2004) 32 Cal.4th 588, 603.)

"[A] presumption under Section 7611 is a rebuttable presumption affecting the burden of proof and may be rebutted in an appropriate action only by clear and convincing evidence." (Fam. Code, § 7612, subd. (a).) However, "[i]f two or more presumptions arise under Section 7610 or 7611 that conflict with each other, or if a presumption under Section 7611 conflicts with a claim pursuant to Section 7610, the presumption which on the facts is founded on the weightier considerations of policy and logic controls." (Fam. Code, § 7612, subd. (b).) "This is a matter entrusted to the juvenile court's discretion. [Citation.]" (*In re Jesusa V.*, *supra*, 32 Cal.4th at p. 606.)

The father contends that "[b]ecause [he] too qualified as a presumed father under [Family Code] section 7611, subdivision (d) and *Kelsey S.*, the juvenile court was required to weigh conflicting interests and make [a] determination that would give greatest weight to [the] child's well[-]being. ([Fam. Code,] § 7612, subd. (b).)" As we held in parts VI.A and VI.B, *ante*, however, the juvenile court properly found that he did not qualify as a presumed father or a *Kelsey S.* father.

18

Significantly, the father does *not* contend that, *even if* he did not qualify as either a presumed father or a *Kelsey S.* father, the juvenile court was *still* required to engage in a weighing process. He does not challenge the juvenile court's finding that he had failed to rebut the presumption in favor of the husband by clear and convincing evidence; moreover, he does not argue that this finding was not sufficient to dispose of his claim. We deem any such contentions forfeited.

D.      *Delayed Paternity Testing and Visitation.*

The father also contends that his constitutional rights were violated because he was not given paternity testing or visitation for several months. He argues that this prevented him from achieving presumed father status.

He forfeited this contention by failing to raise it below. "'A party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court. [Citations.] Forfeiture, also referred to as "waiver," applies in juvenile dependency litigation and is intended to prevent a party from standing by silently until the conclusion of the proceedings. [Citations.]' [Citation.]" (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 686.) Even a constitutional claim can be forfeited. (*In re A.A.* (2012) 203 Cal.App.4th 597, 606 [Fourth Dist., Div. Two].)

## VII

## DISPOSITION

The order appealed from is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI                   

J.

We concur:


HOLLENHORST

Acting P. J.


CODRINGTON

J.